Argued and submitted June 27, reversed and remanded December 3, 2008

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# JAMES DANIEL WARREN,
*Defendant-Appellant.*

Marion County Circuit Court
03C42338; A127680

197 P3d 605

Anne Fujita Munsey, Senior Deputy Public Defender, argued the cause for appellant. With her on the brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Paul L. Smith, Assistant Attorney General, argued the cause for respondent. On the briefs were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Katherine H. Waldo, Senior Assistant Attorney General.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Huckleberry, Senior Judge.

EDMONDS, P. J.

## EDMONDS, P. J.

Defendant was convicted of first-degree sodomy and first-degree sexual abuse of his daughter. On appeal, defendant argues that the trial court erred in allowing the state's expert witness, a physician who examined the victim, to testify that the victim had been sexually abused. Defendant further argues that the trial court erred in excluding testimony by his own expert witness, a psychologist who would have attacked the basis for the physician's diagnosis of child sexual abuse. We agree that the trial court erred in excluding defendant's proffered expert testimony, and we therefore reverse and remand.

In December 2002, defendant's wife found a notebook hidden under the bed of their nine-year-old daughter, A. The notebook contained a handwritten entry from A that indicated that defendant had been "put[ting] his thing up [her] butt" for two years. Defendant's wife immediately asked A whether the allegations were true, and A assured her mother that they were. Defendant's wife then contacted the police.

Deputy Wagner interviewed A at school, and she again maintained that defendant had been abusing her. She told him that defendant would take her to the bedroom, place her on her knees, grab her shoulder, take off her pants, and "put his thing" in her butt. The abuse usually lasted five to 10 minutes, and she would then go to the bathroom to wash herself off. It occurred one or two times per week, but occasionally weeks would pass without any sexual contact.

That same day, Wagner contacted defendant at his workplace and asked him to come to the police station to talk. Defendant agreed to meet Wagner, and he arrived at the station during his lunch hour. Although defendant was not placed under arrest, he was read his *Miranda* rights and informed of the allegations against him.[1] Initially, defendant

---

[1] Defendant's and Wagner's testimony differed at trial as to how specific Wagner was concerning the allegations. Wagner testified that he informed defendant of allegations of "sexual contact" with A but did not "present any kind of scenario" or "say the exact allegations[.]" Defendant, however, testified that Wagner described the specific act that A had disclosed (anal penetration), as well as the fact that it had occurred on more than one occasion.

denied the allegations. Wagner then left defendant alone in a room for five to 10 minutes. When Wagner returned, defendant confessed to an instance four or five months earlier in which he had taken A into the bedroom and inserted his penis into her anus. Defendant then gave the following written statement, consistent with his prior account:

> "I got drunk about four months ago and pulled her pants and underwear and poked at her with my penis. I don't recall any penetration of the anus or vagina area. She was on her knees on the bed. I don't recall saying anything to her or her saying anything to me. I had about four to five beers before it happened to [A], my daughter."[2]

Two weeks after the allegations of abuse surfaced, A was evaluated at Liberty House, a child abuse assessment center. The evaluation began with an interview by Williams, during which A disclosed that defendant "had put his front private part inside of her bottom." The interview was followed by a physical examination, conducted by Dr. McNaughton, the medical director at Liberty House. McNaughton had completed three years of residency in pediatrics, had been in general practice as a pediatrician for 10 years, and had received some specialized training in the area of child abuse. She had been the medical director at Liberty House for six years, had examined almost 700 children for possible abuse, and had supervised more than 1,800 evaluations at Liberty House.

McNaughton had observed the interview of A before the physical examination and was aware that two or three weeks had passed since the last reported abuse. Given that timing, and the ability of anal tissue to stretch and heal quickly, McNaughton had not expected to discover any physical abnormalities. Her observations were consistent with that expectation, and the results of the examination were "normal." The only possible exception was an incident of "spontaneous anal dilation," which McNaughton noted in A's chart. Although the physical examination was normal, McNaughton nonetheless diagnosed A as having been sexually abused. Her diagnosis was based solely on her evaluation

---

[2] Defendant gave an audio-recorded statement to the same effect.

of A's medical history—*i.e.*, A's own report of the sexual abuse.

Defendant was subsequently charged with two counts of first-degree sodomy and two counts of first-degree sexual abuse, and the case was tried to a jury. Before trial, defendant filed a motion *in limine* to exclude certain testimony by McNaughton. Specifically, defendant sought to exclude McNaughton's diagnosis of child sexual abuse as well as any reference to "spontaneous anal dilation." The trial court denied those pretrial motions, and McNaughton testified as an expert witness for the state.

At trial, defendant again objected to the admission of McNaughton's testimony. With regard to the issue of spontaneous anal dilation, defendant argued that McNaughton had not relied on the dilation in arriving at her diagnosis of child sexual abuse and that any mention of anal dilation would tend to inflame and bias the jury. The court overruled that objection, and McNaughton testified about her observation of spontaneous anal dilation. She explained to the jury that spontaneous anal dilation is "not usual" in her examinations and that it is consistent with repeated stimulus of the anal area. She clarified, however, that many things could cause spontaneous anal dilation and that it "is not independently diagnostic of sexual abuse or anything." On cross-examination, McNaughton further clarified:

> "What I described in my report was a finding that I don't see very often. I see lots of kids. We don't always see their anus dilate. We know that there are some people who have repeated penetration of the anus that will have a response which is that the anus dilate[s] more easily. I called her examination normal because I believe that she had a normal anal genital exam, and I don't wish to overstate or overemphasize the finding of dilation.

> "What I was attempting to do in the report was merely note that it happened during her exam and that I didn't see any stool there, which is sometimes the cause for that, and not draw any conclusions from that necessarily."

Defendant made a related objection to the admission of McNaughton's medical diagnosis of child sexual abuse.

Defendant argued that, because McNaughton was not relying on any physical findings to reach her diagnosis of child sexual abuse, the diagnosis was essentially a comment on the credibility of A's prior report of abuse and did not meet the criteria for the admission of scientific evidence. The trial court overruled that objection as well. At trial, McNaughton explained that she had diagnosed A as having been sexually abused. On cross-examination, McNaughton acknowledged that, notwithstanding her notation of anal dilation, her diagnosis was not based on any physical findings but was an evaluation of A's credibility, informed by her own training and experience. She did not elaborate as to what particular training and experience she had in evaluating credibility or explain how that training or experience affected her diagnosis.

In response to McNaughton's diagnosis, defendant sought to offer testimony of his own expert witness, Dr. Stanulis. The state objected on the ground that Stanulis, a psychologist, was not a medical doctor and was therefore not qualified to offer an opinion on the validity of McNaughton's medical diagnosis. In an offer of proof, Stanulis testified regarding "the medical diagnosis of sexual abuse where the only basis for the examiner's conclusion is the mother's questionnaire of the child's history and an interview with the alleged victim in this case[.]" According to Stanulis, in the absence of physical findings, the question is one of "psychological or psychiatric or social science" because "interview techniques, assessing behavioral manifestations of abuse, that's psychology." He explained that, as a psychologist, he would be able "to talk about the weaknesses in [a child abuse] diagnosis, the interrater reliability when people are just assessing the truthfulness, the veracity of the interview data is low; that's not an area where medicine particularly has an expertise, nor anyone." Stanulis further testified that he could address

"the issue of the lack of behavioral or psychiatric or any sequela for the alleged abuse of this child. She had no behavioral problems, no psychiatric problems, no psychological problems; she was not observed in any way, shape, or form to be distressed from a type of abuse that we know from the literature, if true, would be one that we would

expect to see problems because of the nature. The literature again on the effects of sexual abuse on later behavior or behavior is, again, social science data. It's not medical data."

Following the offer of proof, the trial court agreed with the state's argument that Stanulis was not qualified to attack McNaughton's diagnosis:

"[W]e had a medical doctor testify to her opinion within a medical reasonable certainty according to the—her training and her experience. And I found that she was qualified. I do not believe that it's appropriate for Dr. Stanulis to attack that from a psychologist's viewpoint nor that he is qualified to do that or that the foundation has been laid that he's qualified to do that. So I'm going to limit that testimony."

Although the parties spent considerable time discussing A's reports of abuse at Liberty House, that was not the only testimony that A had been sexually abused. At trial, A testified consistently with her earlier reports of abuse. She testified that defendant had been sodomizing her for two to three years and that the abuse sometimes occurred in her room and sometimes in her parents' room. She explained that she had written the note regarding the abuse because she was scared and embarrassed to tell her mother; she had hidden the note but had hoped that her mother would find it.

Defendant also testified at trial. Despite his earlier confession, he denied having any sexual contact with A. He testified that he had fabricated the confession because he was "confused" at the police station and "kind of wanted to protect [A]." According to defendant, he thought that he "could protect her if someone else was doing it. Or if someone had put her up to it, [he] could protect her from anything else happening to her." The jury was not persuaded by defendant's version of the events. He was convicted on all counts.

On appeal, defendant advances eight assignments of error, most of which pertain to the admission of McNaughton's testimony and the exclusion of Stanulis's testimony. Because we agree with defendant that the trial court erred in excluding testimony by Stanulis that would have undermined McNaughton's medical diagnosis of child sexual abuse, we begin with defendant's third assignment of error.

■      In his third assignment, defendant argues that the trial court "erred when it excluded evidence from [Stanulis] challenging the reliability of the medical diagnosis of sexual abuse in this case, as presented in defendant's offer of proof * * *." As explained above, the trial court concluded that Stanulis was not qualified to offer an opinion regarding the validity of McNaughton's medical diagnosis because he was not a medical doctor. We review "without deference for errors of law whether a trial court properly applied OEC 702[3] to decide whether an expert is qualified to give testimony *relative to a particular topic*, because that determination is a question of the application of law." *State v. Rogers*, 330 Or 282, 315, 4 P3d 1261 (2000) (emphasis in original).[4]

As discussed above, McNaughton's medical diagnosis of child sexual abuse—the topic on which defendant sought to offer Stanulis's testimony—was not based on any physical findings. Rather, as McNaughton acknowledged on cross-examination, she reached her diagnosis by simply assessing A's report of abuse in light of her training and experience. Assuming that such a diagnosis is admissible as scientific evidence,[5] there is nothing about that "medical" diagnosis that is within the exclusive expertise of medical doctors.

---

[3] OEC 702 provides that, "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

[4] The state suggests a different standard of review. It argues that the trial court did not abuse its discretion in limiting Stanulis's testimony because defendant did not bring the subject matter of Stanulis's testimony to the attention of the trial court in a timely manner—namely, at an omnibus hearing. According to the state,

"[h]ad defendant wished to challenge the medical diagnosis, nothing precluded him from doing so through the testimony of a medical doctor and having that evidence 'vetted' at the omnibus hearing. Here, defendant offered an expert in one field to testify to subject matter that, in the trial court's view, was outside his area of expertise. In excluding that testimony for both reasons of surprise and on the merits, the trial court did not abuse its discretion."

Although the trial court expressed some frustration with the timing of certain issues regarding Stanulis's testimony, it does not appear to have excluded his testimony—at least as it pertained to McNaughton's medical diagnosis—on the ground that it was untimely. Rather, the trial court excluded that testimony on the ground that Stanulis was not a medical doctor and was therefore not qualified to offer an opinion regarding McNaughton's medical diagnosis.

[5] In his second assignment of error, defendant argues that, in the absence of physical evidence, a physician's diagnosis of child sexual abuse based on the child's own report is an impermissible comment on the credibility of the witness and does not qualify as scientific evidence. Although those issues are likely to arise on

The Supreme Court has, in fact, cautioned against placing too much emphasis on whether an expert possesses a medical degree. In *Rogers*, the Supreme Court explained that a "medical degree is not a necessary predicate to finding an expert witness qualified to testify about medical knowledge, assuming that witness otherwise is qualified to do so." 330 Or at 316.

In *Rogers*, the trial court excluded testimony by a clinical psychologist concerning the possible causes of the defendant's frontal lobe dysfunction, on the ground that the psychologist did not have a medical degree. The Supreme Court reversed:

> "Proper application of OEC 702 requires assessment of the particular qualifications of each witness. We do not assume a disqualification from the lack of a particular educational or professional degree. Accordingly, * * * if [the witness] was 'a properly qualified clinical psychologist,' then it was error not to permit him to testify about the possible causes of defendant's frontal lobe dysfunction. All that remains is to review [the expert's] testimony about his qualifications to determine if he was in fact a 'properly qualified clinical psychologist.' "

330 Or at 316.

Here, Stanulis was unquestionably a "properly qualified clinical psychologist." *Id.* His qualifications included a Ph.D. in clinical psychology, with a specialization in clinical neuropsychology, an area involving the biology of memory as well as the psychology of memory and mental disorders. Stanulis worked as a hospital staff psychologist and as the director of Psychology and Neurospychology at the Rehabilitation Institute of Oregon and Good Samaritan

remand, the record in this case is not well developed regarding the nature of McNaughton's evaluation of A's "medical history." McNaughton testified only that she evaluated A's past statements based on her "training and experience." She did not testify at the omnibus hearing on defendant's motion *in limine*, and her trial testimony did not explain what type of training and experience she was relying upon. Rather than address the scientific validity of McNaughton's diagnosis on the record before us, we conclude that the matter is best left to the trial court to address anew on remand, at which time the record may be different. We also note that the Supreme Court has allowed review in a case that may present the issue framed by defendant's second assignment of error. *See State v. Southard*, 214 Or App 292, 164 P3d 351 (2007), *rev allowed*, 344 Or 401 (2008).

Hospital. Since 1996, his practice had been focused on forensic psychology, and he had developed expertise "in the area of looking at how [one] go[es] about diagnosing sex abuse, investigating it, how * * * interview techniques and the memory of people involved affect the process."

McNaughton testified that, based on her training and experience, it was her medical diagnosis that A had been abused. Stanulis, on the other hand, was prepared to testify, based on his own training and experience, that A did not exhibit the behavioral traits of someone who had been sexually abused and that McNaughton's diagnosis based on A's prior statements was flawed. The dueling opinions concerning the conclusions to be drawn from A's reports of abuse present a typical battle of the experts, albeit from different, but related, scientific fields. The trial court erred in denying defendant the opportunity to meet the state's expert witness testimony on that point.

■     The question remains, however, whether the exclusion of Stanulis's testimony was harmless. *See State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (appellate court must affirm the jury's verdict despite evidentiary error if there is little likelihood that the error affected the verdict); *see also* OEC 103(1) (evidentiary error not presumptively prejudicial). In light of A's testimony at trial and defendant's recanted confession, it is arguable that the case turned on the credibility of defendant and A and that the jury would have reached the same verdict regardless of what expert testimony was admitted regarding A's prior reports of abuse. That said, McNaughton's medical diagnosis in this case certainly bore on A's credibility. *Cf. State v. Keller*, 315 Or 273, 286, 844 P2d 195 (1993) (concluding that the erroneous admission of a physician's comment on the alleged victim's credibility was not harmless, as the witness was a "medical doctor with extensive professional experience in the area of child sexual abuse, and she testified in an authoritative and detailed manner about that subject"). Stanulis's testimony, meanwhile, had the potential to undermine both McNaughton's and A's credibility. Under those circumstances, we cannot say that the error in excluding Stanulis's testimony had little likelihood of affecting the verdict.

Defendant also challenges a pretrial ruling that granted the state's motion to quash a subpoena *duces tecum*. We affirm that pretrial ruling without discussion.

Reversed and remanded.