Argued and submitted December 3, 2008, remanded for modification of parenting plan to allow mother one four-week parenting period each year for travel to Australia; otherwise affirmed April 29, petition for review denied September 17, 2009 (347 Or 42)

In the Matter of the Marriage of

Alec FEDOROV,
*Petitioner-Respondent,*
*and*

Kristin FEDOROV,
*Respondent-Appellant.*

Lane County Circuit Court
150302395; A135107

206 P3d 1124

George W. Kelly argued the cause and filed the briefs for appellant.

Charles Spinner argued the cause for respondent. On the brief were Stacey D. Smith and Spinner & Schrank.

Before Landau, Presiding Judge, and Schuman, Judge, and Deits, Senior Judge.

LANDAU, P. J.

**LANDAU, P. J.**

Mother appeals a judgment denying her motion to modify a parenting plan to permit her to move with her child from Oregon to Australia. In denying mother's motion, the trial court found that it is not in the child's best interests to permit the relocation. On appeal, mother advances three assignments of error: (1) the trial court erred in excluding the testimony of a vocational expert, through whom mother sought to introduce evidence of father's employability in Australia; (2) the court erred in denying her the "right" to relocate with the child to Australia; and (3) the court erred in deciding mother's motion based only on the child's best interests, without also considering mother's constitutional rights, as the custodial parent, to make decisions concerning the child's welfare and to travel.

We agree with mother that the trial court erred in excluding the testimony of the expert witness. Even taking into account that testimony, however, on *de novo* review, we conclude that the trial court did not err in finding that it is not in the best interests of the child to permit the relocation. We reject mother's constitutional arguments as well and therefore affirm.

## I.  FACTS

Mother was born and raised in Australia, and her parents and other family members live there, not far from Melbourne. Father was born in Russia, but immigrated to the United States with his parents in 1981, at the age of 14, and became an American citizen. He attended high school in Texas and went to college in California. He ultimately graduated from medical school and became an orthopedic surgeon.

Father and mother met in Australia in 1998, when he was on an eight-month fellowship. He returned to a job in Los Angeles, where his parents now live. In April 1999, mother came to visit him in Los Angeles. The two became engaged and were married a month later.

The parties initially resided in Los Angeles, but mother wanted to relocate further north. Father preferred to move to Portland. Mother did not want to live there and preferred to move to Florence. Father acceded to her preference,

and they moved to Florence, where he took a position with a local hospital. They have resided there since. The parties' only child, C, was born in February 2001. C has both United States and Australian citizenship.

The parties were divorced in July 2003. They negotiated a marital settlement agreement that resolved all issues, including child custody. The stipulated dissolution judgment awarded "modified sole custody" of C to mother, subject to father's parenting time. The judgment provided that mother would consult with and seek input from father on all major decisions, including "education, health, religious training, [and] residency"; that each party would support the other's role as a parent; that C's best interests required that each parent have an active and constructive role in C's life; and that father's parenting time would increase over time.

Seven months later, mother decided that she wanted to move to Australia with C, who was then three. In mother's view, the move was required for her own well-being and personal growth, as well as for C's benefit, because it would enhance mother's employment and housing options, provide better educational opportunities for C, and allow both of them to have the support of mother's family and friends. Mother also believed that circumstances all around were better in Australia than in Florence. She recognized that C's relationship with father was strong and important and that a move to Australia would disrupt that relationship. Her proposed solution was for father to move to Australia as well, where she believed he could easily find work. Mother asserted that father had promised her that someday they could move to Australia.

Father opposed the proposed move to Australia, and he denied ever promising mother that he would do so. He sought a modification of the dissolution judgment to award him sole custody of C.

The parties submitted their dispute to Dr. Loveland, a clinical psychologist and custody evaluator with some 30 years of experience who has performed hundreds of custody evaluations and approximately 50 evaluations involving the issue of relocation. Loveland conducted multiple clinical interviews and psychological evaluations of both parents, as well as multiple observation and assessment sessions with

each parent and the child over a two-month period. He also received personal references and other information from 30 different individuals. Loveland authored a 22-page, single-spaced "custody, parenting plan, and relocation evaluation" in September 2004, in which he addressed each of the factors set forth in ORS 107.137, which governs the determination of the best interests of the child in custody, parenting plan, and relocation cases. Loveland opined that both mother and father are excellent parents and well bonded to C, and that a parenting plan should be developed that could best maintain C's current relationships, including the relationships with her grandparents on both sides. Because of mother's role as the primary parent, Loveland concluded that it was not in C's best interests to change custody to father, and he expressed the view that, should the trial court approve mother's move, mother should retain custody.

In Loveland's view, however, it was important for C, at her young age, to live near father, so that she could develop and maintain a strong bond with him. In Loveland's opinion, to satisfy that requirement, there were only two options in C's best interests: "[T]he first option * * * would be for both parents to move to a larger city [in Oregon] where the adult and child issues could be addressed in a positive fashion." Loveland opined that the second option in C's best interests would be for father "to support [C]'s relocation to Australia and move there himself." Mother rejected the first option, he noted, because it did not meet her need for support from her family in Australia and would remove her from her own friends and C's friends in Florence, leaving them isolated. And Loveland observed that father ruled out the second option because of concerns about his ability to pursue his medical career in Australia.

In view of the parties having rejected what he regarded as the two best options for C, Loveland strongly recommended against mother's move. He explained:

"At a general level, it is well accepted within the mental health field that relationships with both parents continue to play a crucial role in shaping children's social, emotional, personal, and cognitive development well into the middle childhood and adolescent years. It is also well accepted that there are adverse effects to children's development and

adjustment when healthy parent-child relationships are disrupted. Since long-distance moves may severely erode established relationships between three-year-olds and their non-moving parent unless there is broad and meaningful interaction at least every month, a relocation to Australia will present insurmountable challenges to the father-daughter relationship. * * * Potential harm to [C] in allowing a relocation to Australia becomes a particularly crucial issue for the Court to consider. The Court essentially will be deciding whether [C] is to have one parent figure or two."

Loveland acknowledged that, from mother's perspective, there were great advantages to her being close to her own immediate family and the educational and employment opportunities available to her in Australia. However, Loveland rejected the notion that mother's own personal happiness should predominate in determining the best interests of the child. He explained:

"There are some mental health professionals who believe that the 'happy mom, therefore happy child' criteria should be employed in making these decisions. However, the majority view, I believe, is that the child's best interest is most appropriately served by what would be in the best interest of the entire family system. At [C]'s level, this proposed relocation is purely optional. All of her physical, mental, educational, social, and emotional needs can easily be met in the United States, although probably not in Florence with the high standards that these parents have. A move to Australia will really only benefit one member of this family system. [Mother] would be better off, and the mother-daughter relationship would be easily maintained. However, [father] would be significantly harmed. [C] would be significantly harmed because the father-daughter relationship would predictably erode. From a family system point of view, the relocation would not be in [C]'s best interest."

Loveland stated that "it is clearly in [C]'s best interest to maintain a close, frequent, and proximate relationship with both of her parents, particularly during her young and middle childhood years." In Loveland's view, because of the geographical distance, no developmentally appropriate parenting plan could be devised to maintain the father-daughter bond if mother moved to Australia. Because he viewed

mother's proposed move to Australia as optional, rather than essential, Loveland believed that the potential harm to C with respect to the loss of her relationship with father outweighed the benefits to mother in making the move. "Since a relocation to Australia is likely to permanently harm the father-daughter relationship," he commented, "such a relocation could not be considered to be in [C]'s best interest." Loveland explained:

"These parents need to be encouraged to accept the logical consequences of the personal and interpersonal decisions that they have made together. [Mother] was not forced to move to the United States. [The parties] were not forced to marry. [The parties] willingly became good and involved parents of [C]. Both [parents] bear significant responsibility for the demise of their marriage. Having now divorced, these intelligent, caring, resourceful, and highly skilled individuals need to come up with a plan where they bear the inconvenience of the divorce rather than passing most of that inconvenience to [C]."

Based on Loveland's recommendations, mother decided not to move to Australia. Father withdrew his request for a change in custody, and the parties settled their dispute. Following the settlement, on December 3, 2004, a stipulated supplemental judgment was entered, which provided:

"Relocation Based on Dr. Loveland's custody, parenting time and relocation evaluation, (attached hereto and incorporated herein as Exhibit A) Mother has agreed not to relocate to Australia. Both parties shall remain in the United States and either or both parties may continue to reside in Florence, Oregon."

(Underscoring in original.) The judgment provided, further:

"Each calendar year, Mother shall have the right to travel to Australia with [C] either two times for up to four weeks or one time for up to five weeks. Mother shall provide Father with ninety (90) days written notice of her proposed dates of travel, except in the event of a family emergency, but may be flexible within three to four days of the dates of travel in order to take advantage of breaks in airfare."

Father also agreed that he would pay for airfare to Australia for C for one trip per year. The airfare obligation was to be

treated as spousal support by the parties and was to terminate on C's eighteenth birthday, or "upon any future filing by Mother to relocate from the United States unless otherwise agreed to by the parties in writing."

Eighteen months later—and notwithstanding the stipulated supplemental judgment providing that "Mother has agreed not to relocate to Australia"—mother again decided that she wanted to move with C to Australia. She filed a second motion to modify the parenting plan, once again asserting that housing, employment, educational opportunities, and circumstances in general were better for her and for C in Australia. Father once again objected to the move, and once again sought a modification of the dissolution judgment to award him custody of C, who was then five years old, or, in the alternative, to modify the parenting time schedule.

The matter went to trial. Over the course of the five-day proceeding, the trial court heard testimony from some 25 witnesses. In general, the evidence was that the parties were in essentially the same positions that they were in when the subject of relocation arose in 2004. The child is happy and well adjusted. Mother continues to be the primary parent, but the child sees father often and is strongly bonded to both parents. Both mother and father continue to be exceptional parents. Both parents are now affirmatively seeking to leave Florence, but father wants to remain in Oregon. Mother continues to assert that father promised her that someday they would move to Australia, especially for C's education, and she seeks to hold him to that promise. Mother also believes that father would have no difficulty finding work in Australia and that he would follow her there if the court authorized the relocation. Father says that he will not move to Australia, and denies having made a promise to move, although he acknowledged agreeing to allow C to attend a university in Australia and to consider relocating there to be near her at that time.

Loveland, who had authored the custody and relocation evaluation in 2004, testified, adhering to his recommendation against allowing mother to relocate with C to Australia. Loveland testified that, if anything, C would be at

risk of even greater harm in the event of such a move than when he made his original recommendation. According to Loveland,

> "six-year-olds are highly attuned to parental loss. They're in a stage of really finalizing some bonds and attachments, that's obviously going to continue on for the next several years, but fives and sixes are particularly prone to parental loss and feelings of abandonment."

He explained that three-year-olds—C's age at the time of his original evaluation—are capable of experiencing such abandonment, but, with five- and six-year-olds, "it would be more potent for them because they would have more of a cognitive understanding of the loss." He explained that the grieving process would be exacerbated if father were required to participate in a long-distance parenting plan with substantial amounts of time between visits:

> "If he were put on an inappropriate long-distance parenting plan, [C] would get reattached with him when she is with him, grieve the loss, get reattached, grieve the loss. We're essentially creating a complicated grieving process for [C] with the length of time that would have to exist in between contact."

Mother offered the testimony of Susan Foster, a vocational rehabilitation counselor, to support her contention that father could move to Australia and readily find work there. Father objected to Foster's testimony based on her total lack of experience, much less expertise, in seeking employment in Australia. The trial court sustained the objection. In an offer of proof, Foster testified that she has owned her own vocational counseling business since 1999 and has conducted investigations of employment opportunities in many different markets and for many different types of employment. She acknowledged, however, that she has never before researched employability in Australia. She testified that, based on her correspondence with various employment officials in Australia, she learned that there is a shortage of physicians in that country and that the particular area where mother seeks to locate has been identified by the government in Australia as an "area of need."

The trial court denied mother's motion to modify the parenting plan to permit her to relocate with C to Australia. It also denied father's motion to modify the dissolution judgment to award him sole custody of C. The court explained its decisions in 30 transcript pages of detailed and carefully articulated findings of fact and conclusions of law. The court noted that, under the applicable statutes, the controlling question is whether the proposed move to Australia is in the best interests of the child. According to the trial court, "[i]t's clear to the court, based upon the testimony, that it may be easier for mother in Australia. But it is not in the best interests of the child to go to Australia."

The trial court explained that several factors were of particular importance in evaluating the best interests of the child generally and the risk of harm to the child posed by a move to Australia particularly. First, the court noted father's history of involvement with the child and that he "has taken virtually all opportunities to be with his child when he is able to do so, and when allowed by mother to have him do so." The court noted that a move would be detrimental to father's ability to continue that level of involvement. Second, the court noted the geographical distance involved in a move to Australia, which would make unrealistic any frequent contact between father and the child. Third, the court noted the "cognitive and moral status of the child," which the court explained could predict coping responses and resiliency in the face of relocation. The court observed that, as explained by psychologist Beikel, the child—at just shy of six years of age—would likely find relocation to Australia "destabilizing and traumatic. And it would be even more destabilizing and traumatic to lose a parent for a significant period of time at age six, more than at age three when the stipulated judgment was entered into." Fourth, the court noted the psychological health of each parent, including the extent to which each parent promotes a healthy relationship with the other. The court found that father "is better at facilitating the relationship between child and mother than mother is to father." In fact, the court noted several examples showing mother's troubling tendency to interfere with father's contact with C. The court expressly relied on "Dr. Loveland's extensive and detailed

report regarding the devastating effect on this child in relocating." The court concluded that,

> "[g]iven the factors that the Court has analyzed, and based upon the evidence, the totality of the circumstances, and Oregon law, which the Court has reviewed, mother's stated basis for moving does not outweigh the devastating cost and harm to this child and her healthy relationship with her father where she experiences and benefits from father's ongoing involvement in her life."

The trial court also provided a revised parenting time schedule, which included a provision that, "[f]or the summer of 2008, and each summer thereafter, each parent shall have 1/2 of the summer vacation which, unless otherwise agreed, shall be exercised in two week alternating blocks," effectively providing only two weeks each summer for mother to take the child to Australia. The parties subsequently stipulated to giving mother three weeks of parenting time annually for trips to Austrailia.

## II. ANALYSIS

On appeal, as we have noted earlier, mother advances three assignments of error: (1) the trial court erred in excluding vocational expert Foster's testimony; (2) the court erred in "denying the mother the right to relocate" with C to Australia; and (3) the court erred in failing to take into account mother's constitutional rights, specifically, her right to travel and her right to exercise parental control of her child. We address each assignment in turn.

### A. *Exclusion of Foster's testimony*

■■ We review for errors of law the trial court's ruling sustaining father's objection that Foster was not qualified under OEC 702[1] to give testimony on the particular topic of father's employability in Australia. *State v. Rogers*, 330 Or 282, 315, 4 P3d 1261 (2000); *State v. Warren*, 224 Or App 204, 211, 197 P3d 605 (2008). In determining whether a witness is

---

[1] OEC 702 provides, in part:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

qualified to testify as an expert, the question under OEC 702 is whether, by virtue of knowledge, skill, experience, training, or education, the witness's testimony would be of assistance to the trier of fact in understanding the evidence or determining a fact in issue. The record shows that Foster has extensive experience in vocational counseling. Accordingly, she was qualified as a vocational expert and should have been permitted to give an opinion as to father's employability as a physician in Australia; any shortcomings in her experience with respect to Australia go to the weight of her testimony. *Rogers*, 330 Or at 315. We therefore take into account Foster's testimony, introduced by way of mother's offer of proof, in our *de novo* review of the trial court's decision on the merits.

B. *Denial of mother's request to relocate*

Mother frames her second assignment in the following terms: "The court erred in denying mother the right to relocate" with C. According to mother, "unless there is some significant detriment to the relocation, there is no good reason to disapprove it." Mother suggests that there are no such detriments to the relocation. Moreover, mother contends, if it is assumed that both parents made the move, C "would be at least as happy in Australia as in Florence." As a result, she asserts, "this case is less about [C's] best interest and more about fairness."

Father responds that mother misapprehends the applicable law, which plainly specifies that modifications of parenting plans—including modifications involving relocation requests—must be based *solely* on the best interests of the child. In this case, father contends, mother has not met her burden. According to father, at best, mother has demonstrated that it would be in *her* interest to move to Australia. But it does not necessarily follow, he contends, that, merely because it is in mother's interest to move, it is in C's interest to do likewise. Mother, he contends, has ignored all of the evidence in the record about the harmful effect of relocation on C, particularly at her young age.

We begin with the matter of the applicable law. In brief, father is correct that mother misapprehends the standard that we are required to apply. In Oregon, unlike in some

states, the custodial parent does not enjoy a presumptive right to relocate with the child. *See, e.g., In re Marriage of LaMusga*, 32 Cal 4th 1072, 1098, 88 P3d 81, 98 (2004); *In re Marriage of Burgess*, 13 Cal 4th 25, 38, 913 P2d 473, 482-83 (1996) (placing burden on noncustodial parent to show move will be harmful to child); *Kaiser v. Kaiser*, 23 P3d 278, 282 (Okla 2001) (custodial parent has presumptive right under Oklahoma statute to move with the child). That is not because we regard the interests of the custodial parent to be insignificant. Nor is it because of our own evaluation of the exceedingly complex and competing policies that pertain to parental decisions to relocate. It is, rather, because the matter has been decided by the Oregon Legislative Assembly.

The Oregon legislature has determined that, at least in the context of a proceeding to modify a parenting plan, the sole determinants are the best interests of the child and the safety of the parties. As we explained in *Cooksey and Cooksey*, 203 Or App 157, 165, 125 P3d 57 (2005),

> "ORS 107.102 provides that, in any proceeding to modify a judgment providing for parenting time, there must be developed and filed with the court a general or detailed parenting plan. A 'detailed' parenting plan may include, among other things, provisions relating to residential schedules; holiday, birthday, and vacation schedules; and 'relocation of parents.' ORS 107.102(3)(f). The parties can agree to such a detailed parenting plan, or the court may be called to develop one if requested by the parties or if the parties are unable to agree. ORS 107.102(4). In developing such a parenting plan—which expressly includes provisions relating to the relocation of parents—'the court may consider *only* the best interests of the child and the safety of the parties.' ORS 107.102(4)(b)."

(Emphasis in original.)

In that regard, it may be useful to note a distinction between modifications of parenting plans and modification of child custody itself. The issue of relocation may arise in either context, but the law that applies is significantly different depending on whether it is raised in one context or the other.

As we have just noted, if the issue of relocation arises in the context of a dispute over the parenting plan, ORS

107.102 controls, and the dispositive question is whether the relocation is in the best interests of the child. *Cooksey*, 203 Or App at 165. The party seeking modification of the parenting plan does not have the obligation to demonstrate a substantial change of circumstances since the entry of the original dissolution judgment. *Cole v. Wyatt*, 201 Or App 1, 7, 116 P3d 919 (2005) ("[T]he modification of parenting time does not require a showing of a substantial change of circumstances.").

■        In contrast, if the issue of relocation arises in the context of a motion to modify child custody itself, the parent seeking the modification has the burden of demonstrating a substantial change of circumstances. *Colson and Peil*, 183 Or App 12, 21, 51 P3d 607 (2002) (in a relocation case, the party seeking the change of custody "has the burden to show that there [has] been a substantial change of circumstances since the time of the original custody award"). Moreover, the parent seeking the change of custody must demonstrate that the change of custody—which, depending on the case, may mean relocating or not relocating—is in the best interests of the child. *Hamilton-Waller and Waller*, 202 Or App 498, 510, 123 P3d 310 (2005).

In this case, mother's appeal involves a challenge to the trial court's decision on her motion to modify the parenting plan; father did not appeal the denial of his motion to change custody. As there is no issue concerning the safety of the parties, the controlling question therefore is whether her proposed move to Australia is in C's best interests, that is, whether the child is *"better* served" by relocating. *Meier and Meier*, 286 Or 437, 447-48, 595 P2d 474 (1979) (emphasis in original). In determining whether relocation is in the best interests of the child, we draw guidance from the list of factors set out in ORS 107.137 that pertain to determining the best interests of a child in custody cases. *Cooksey*, 203 Or App at 167. Those include the emotional ties between the child and the parents, the interest of the parties in and attitude toward the child, the desirability of continuing existing relationships, the preference for the primary caregiver, and the willingness and ability of each parent to facilitate a close and continuing relationship between the other parent and the

child. ORS 107.137(1). Also relevant is the statutory admonition that, in establishing a parenting plan, the court "shall recognize the value of close contact with both parents and encourage, when practicable, joint responsibility for the welfare of [the] children and extensive contact between the minor children of the divided marriage and the parties." ORS 107.105(1)(b).

In reviewing a trial court's best interests determination, we are mindful of the trial court's better vantage point in observing witnesses' demeanor and credibility. Indeed, as we noted in *Cooksey*, early case law refers to the trial court's "discretion" to determine whether to permit relocation. *See, e.g., Meier*, 286 Or at 446 (relocation decisions are "weighted with a presumption that the court has properly exercised its judicial discretion in determining what is for the best interest of the child"). We have noted that the notion of reviewing relocation decisions for an abuse of discretion cannot be reconciled with our statutorily prescribed *de novo* standard of review. *Cooksey*, 203 Or App at 172. Nevertheless we have concluded that, "in reviewing trial court decisions that so often involve considerations of credibility and demeanor, we do so cautiously, reversing only for clearly articulable reasons." *Id.*

With the foregoing principles in mind, we have carefully evaluated mother's request to relocate with C to Australia in light of each of the factors set forth in ORS 107.137. In the end, we agree with the trial court that the evidence does not show that a move to Australia is in C's best interests. Certainly, we find no "clearly articulable reasons" for reversing its decision. We can, in fact, hardly improve upon the court's careful and thorough findings, which we have already summarized. We add only some brief responses to several of mother's arguments on appeal.

Mother complains that the trial court failed to give adequate weight to the potential benefits of her proposed move to Australia. No doubt, there are potential benefits to the proposed move. But nearly all of the benefits that mother describes are benefits to her, not to her child. Mother, for example, emphasizes that moving to Australia would enable her to be near her family, to find employment, and to be "less

stressed." In mother's words, if permitted to move with C to Australia, she "will be happier. A happier parent is a better parent," which, presumably, is better for the child. Loveland, however, directly responded to that contention, noting that, although some mental health professionals subscribe to the "happy mom, therefore happy child" approach, the majority view is that the best interests of the child are not determined by reference to what would make the custodial parent alone most happy; rather, they are determined by a broader evaluation of the child's interests in the context of the post-divorce family.

Mother also complains that the trial court gave insufficient weight to the availability of a variety of social services in Australia, such as subsidized housing and utilities, single-parent subsidies, and government-provided health care. Again, however, those are primarily benefits to mother, not to her child. Moreover, her argument assumes that such resources exceed those available and provided to C in Florence, which the record does not support.

Perhaps more than anything else, mother complains that preventing her from moving to Australia simply is not "fair" to her. The problem with that argument is that—even assuming for the sake of argument that it is, in fact, unfair not to approve her proposed move to Australia (something that we do not assess)—fairness to one parent or the other simply is not among the factors that the relevant statutes list as relevant considerations in determining what is in the best interests of *the child*.

In a related vein, mother contends that the trial court should have required father to move to Australia, "or, at least, leave him with no good option but to move." We are aware of no authority that empowers a court to order a parent to move to another country, and mother cites none. More importantly, mother again takes insufficient account of what ORS 107.102(4) unambiguously states is the sole determinant in a modification of parenting plan case, namely, whether modifying the plan as requested—in this case, allowing mother to move to Australia with C—is in the best interests of the child. As the trial court correctly determined, mother did not meet her burden in that regard.

## C. *Mother's constitutional right to travel*

Finally, mother asserts that the trial court erred in failing to give adequate consideration to her constitutional rights. Mother relies on two constitutional rights, in particular. First, she contends that the trial court's rejection of her relocation proposal violates her constitutional right to travel, as recognized in *Shapiro v. Thompson*, 394 US 618, 89 S Ct 1322, 22 L Ed 2d 600 (1969). According to mother, at the very least, the trial court should have balanced its determination about the best interests of the child against mother's constitutional right to travel. In her view, under the circumstances of this case, her need to relocate is so substantial that, on balance, it would "trump whatever concerns the trial court had about a detriment to [C's] best interest."

Second, mother contends that the trial court's decision also violates her constitutional right to control the upbringing of her child, recognized in *Troxel v. Granville*, 530 US 57, 120 S Ct 2054, 147 L Ed 2d 49 (2000), as a right of custodial parents guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

Father responds that, while mother certainly has constitutional rights, both to travel and to make decisions about the care, custody, and control of her child, her argument in this case ignores the fact that he, too, is one of C's parents with constitutional rights. It simply does not follow, father argues, that, merely because mother wants to move to Australia with their child, she has a constitutional right to do so. Moreover, he contends, mother neglects to take into account the possibility, recognized by Justice Stevens in his concurring opinion in *Troxel*, that the child possesses constitutional rights, as well.

■ We begin with mother's right to travel argument. In *Shapiro*, the United States Supreme Court did recognize a constitutional right to travel, although it declined to specify the source of the right. 394 US at 630. What the Court recognized, however, was the right of a citizen to travel "from one State to another." *Id.* If a state law infringes on that right, the law must be supported by a compelling justification. *Id.* at 634.

Whether a state's interest in protecting the interests of children provides such a justification is an interesting question. At least one state court holds that the right to interstate travel prevails unless there is evidence of "the detrimental effect of the move upon the children." *Watt v. Watt*, 971 P2d 608, 616 (Wyo 1999). Other courts—perhaps most—have concluded that the state's interest in protecting the welfare of children does provide the required justification. *See, e.g., Hall v. Hall*, 705 So 2d 397, 400 (Ala Civ App 1997), *cert quashed* (Ala 1997) ("[A] parent's fundamental right to travel can be overcome by the compelling state interest in the best interests of the child."); *Ziegler v. Ziegler*, 107 Idaho 527, 534, 691 P2d 773, 780 (1985) ("Providing and assuring the maximum opportunities for parental love, guidance, support and companionship is a compelling state interest that * * * warrants reasonable interference with the constitutional right of travel[.]"); *Carlson v. Carlson*, 8 Kan App 2d 564, 566, 661 P2d 833, 836 (1983) (legitimate state interest in restricting residence of custodial parent has priority over parent's constitutional right to travel); *LaChapelle v. Mitten*, 607 NW2d 151, 163 (Minn Ct App 2000), *rev den* (2000), *cert den*, 531 US 1011 (2000) (upholding infringement of parent's right to travel because the state has a compelling interest in protecting the best interests of the child); *In re Marriage of Cole*, 224 Mont 207, 213, 729 P2d 1276, 1280-81 (1986) ("We believe that furtherance of the best interests of a child, by assuring the maximum opportunities for the love, guidance and support of both natural parents, may constitute a compelling state interest worthy of reasonable interference with the right to travel interstate."). Still others hold that what is required is a balancing of the needs of the child against the rights of the parents. *See, e.g., In re Marriage of Ciesluk*, 113 P3d 135, 146 (Colo 2005); *Baxendale v. Raich*, 878 NE2d 1252, 1259 (Ind 2008).

In this case, however, we need not weigh in on that issue, because the right of a parent to travel *between states* is not implicated. Mother wishes to travel to another *country*, which implicates a different right from the one discussed in *Shapiro*. The United States Supreme Court has made clear

that, although international travel is protected under the Fifth Amendment, it "is not to be judged by the same standard applied to laws that penalized the right of interstate travel." *Califano v. Aznavorian*, 439 US 170, 177, 99 S Ct 471, 475, 58 L Ed 2d 435 (1978). According to the Supreme Court, the right to international travel is regarded as " 'no more than an aspect of the "liberty" protected by the Due Process Clause of the Fifth Amendment. As such, this "right," * * * can be regulated within the bounds of due process.' " *Id.* at 176 (quoting *Califano v. Torres*, 435 US 1, 4 n 6, 98 S Ct 906, 55 L Ed 2d 65 (1978)). Thus, restrictions that have an incidental effect on international travel do not violate the federal constitution unless they are wholly irrational. *Califano*, 439 US at 177.

We have found no case that suggests that the statutory best interests standard that guides a court's determination whether to allow a custodial parent to relocate with a child to a foreign country is "wholly irrational." Nor does mother argue that, on the facts of this case, the restriction on her right to travel is wholly without reason. Accordingly, we conclude that neither the standard set out in ORS 107.102(4)(b) nor our application of it in this case violates mother's constitutional right to international travel.

That leaves mother's argument that she possesses an independent right to travel to Australia with her child as a result of her constitutional right to make decisions about the welfare of her child, as recognized in *Troxel*. At the outset, we note that there was no majority opinion in *Troxel*. A majority did agree with Justice O'Connor's statement in her plurality opinion that the Due Process Clause of the Fourteenth Amendment protects "the fundamental right of parents to make decisions concerning the care, custody and control of their children." 530 US at 66. It is worth emphasizing, however, that the statement pertained to the constitutional rights of *both* biological parents, not just a parent who has been awarded custody or the majority of parenting time. *Troxel*, in fact, did not involve a dispute *between* parents; rather, it involved the rights of biological parents as against third-party nonparents. Accordingly, the decision simply does not support what mother claims from it.

D.   *Parenting time modification*

■        The most recent parenting plan, approved on November 6, 2007, by the trial court, allows for up to three weeks of parenting time to mother each year for travel to Australia. Mother requests that, if we affirm the trial court's ruling on her request to relocate, we should modify the parenting plan to give her a parenting period of four weeks, so that she may more comfortably visit Australia with C. We agree with mother that one four-week parenting period each year is appropriate so that mother and C can travel to Australia.

        Remanded for modification of parenting plan to allow mother one four-week parenting period each year for travel to Australia; otherwise affirmed.