Argued and submitted December 7, 2010, affirmed September 21, 2011

In the Matter of the Marriage of

Michael A. MAURER,
*Petitioner-Appellant,*
*and*

Neelu Kohli MAURER,
*Respondent-Respondent.*

Clackamas County Circuit Court
DR08030082; A142251

262 P3d 1175

Helen C. Tompkins argued the cause for appellant. With her on the briefs was Tompkins Law Office.

Philip F. Schuster, II, argued the cause and filed the brief for respondent.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Duncan, Judge.

DUNCAN, J.

**DUNCAN, J.**

At issue in this case is whether it is in the best interests of the children for mother, their custodial parent, to relocate with the children from Oregon to California. After multiple hearings on the matter, the trial court awarded mother custody and accepted her proposed parenting plan, which allowed her to move to California with the children. Father appeals; he contends, *inter alia*, that the trial court erred in allowing mother to move to California because the children's best interests are not served by the move and that the trial court erred in awarding mother attorney fees. We reject father's contention regarding attorney fees without discussion, and, on *de novo* review, ORS 19.415(3) (2007),[1] we conclude that the trial court did not err in finding that the relocation is in the children's best interests. Therefore, we affirm.

We begin with the facts. Mother was born in India, and her family moved to the United States when she was seven years old. Her parents live in Michigan, and her brother and his family live in Dublin, California, which is in the San Francisco Bay Area. Father was raised in California, and his parents live in the Bay Area, about a half hour from mother's brother and his family.

Both parties are doctors. They married in November 1997, when they were living in Michigan and working at a hospital in Detroit.

In 2001, the parties' son, A, was born, and the family moved in with mother's parents. At the time, both mother and father worked long hours, and mother's parents spent a significant amount of time caring for A.

In 2003, mother, father, and A moved to Eugene. Father worked as an emergency room physician, first for a hospital in Roseburg and then for a hospital in Albany. At the time of trial, father worked—as he had throughout the parties' marriage—12 to 14 shifts per month. His shifts are 12

---

[1] The 2009 amendments to ORS 19.415, which make *de novo* review discretionary in domestic relations cases, apply only to appeals in which the notice of appeal was filed on or after June 4, 2009. Or Laws 2009, ch 231, § 3. This appeal was filed before that date; therefore, the amendments do not apply.

hours long, 7:00 a.m. to 7:00 p.m. or 7:00 p.m. to 7:00 a.m., and his schedule alternates day and night shifts.

When the parties moved to Oregon, they agreed that mother would work part time. She worked as an emergency room physician, first for a hospital in Florence and then for a hospital in Dallas. In 2005, mother took time off work when the parties' daughter, K, was born. In 2006, the parties moved to Lake Oswego, and, in 2007, mother stopped working outside the home.

Mother's parents visited the parties in Oregon frequently, often at mother and father's request. They visited three to four times per year, staying several weeks each time. During their visits, mother's parents stayed with the parties and often watched A and K when the parties were unavailable to do so.

During the marriage, mother was primarily responsible for the children's schedules and basic daily care. It was not uncommon, when working a day shift, for father to leave for work before the children were awake and return after they had gone to bed. However, if mother was working, father usually assumed the parenting duties.

The children developed a close bond with mother's parents and her brother and his family. Mother and the children visited her brother and his family in the Bay Area two to three times per year. During extended visits, father would join the family near the end of their stay. Although father's parents also live in the Bay Area, the family did not visit them as often and did not stay with them.

In January 2008, the parties separated. Although the parties discussed whether their marriage could be salvaged, the parties executed a marital settlement agreement (MSA) detailing the terms if the parties were to dissolve their marriage. By its terms, the MSA permitted mother to move with the children out of Oregon.

Mother ultimately decided to relocate to California with the children. After the separation, father agreed that mother could take the children on a five-week trip to visit her family in California. Before she left, however, father stopped by the family home and saw that mother had already started

moving things to California. Alarmed, father filed for divorce and for a temporary protective order of restraint. Mother returned from California in April, at the end of the five-week timeframe to which the parties had agreed. Between the separation in January and mother's return to Oregon in April, father visited with the children eight to 14 times, including a visit in California, but he never had them overnight.

The trial was held over five days between July 15, 2008 and January 22, 2009, and focused, as pertinent to the issues on appeal, on the issue of mother's relocation to California. At the time of the trial, A was seven and K was three.

At trial, the parties agreed that mother needed to return to work. Mother testified that she planned to work part time—four to six eight-hour shifts per month—for a few years and transition to full-time work once K was in school. Mother sought positions in emergency medicine and urgent care and testified that, despite diligent efforts, she was unable to find work in the Portland area. She was, however, able to find a position in the Bay Area—to which she could commute from her brother's home. Allan Zatzman, a permanent placement recruiter for emergency medicine physicians, agreed with mother that, based on her qualifications and job requirements, the Bay Area offered a better job market than the Portland area.

Father offered contrary testimony from Susan Martin, a vocational rehabilitation consultant. Martin testified that she called various hospital recruiters and medical staffing agencies to determine the availability of positions in emergency medicine or urgent care in Oregon. According to Martin, there were several openings in those two specialties; however, Martin was unable to say whether those positions met mother's specific job criteria or whether mother herself had already contacted those facilities. Many of the Oregon positions, Martin acknowledged, were temporary or located in rural or coastal areas throughout the state.

In addition to employment advantages, mother testified to the benefits that the children would gain from moving to California. According to both parties, the Dublin, California, area has an extensive Indian community. Mother

testified that the children, as a result of their frequent visits, were already involved in the community, which supported their cultural and religious development. Mother testified that Portland's Indian community is smaller and lacks the benefit of her extended family.

Mother testified that, if she was able to relocate, she planned to live with her brother and sister-in-law for a few months, before moving with the children to a home nearby. As a result, she would have free childcare and not need nannies or day care as she would in Portland. Mother's sister-in-law agreed that she would be available to watch A and K, and that the parties' children and her children were "like brothers and sisters." She also testified that mother's parents were in the process of moving from Michigan to California and would live with mother's brother and sister-in-law indefinitely.

According to mother, relocating to California would not meaningfully reduce the frequency of contact between father and the children given father's work schedule. At the time of trial, father had parenting time with the children every other weekend, including one overnight. That schedule reflected limitations imposed by father's 12-hour shifts as well as recommendations from A's therapist that, because of separation anxiety that A exhibited after the parties' separation, parenting time with father should be limited and increase gradually as A's anxiety decreased. Mother proposed that, if she and the children relocated, the parties should maintain the alternate weekend schedule and work at extending the overnights with father to two. Mother anticipated that, "as the children get older and more independent, [father would] spend more time with them." Mother also proposed that, for two out of three weekends that father had parenting time, father could fly to California to visit the children and either stay at his parents' home or, eventually, in her home while she stayed with her brother. For the third weekend that father had parenting time, mother would fly to Portland with the children. According to mother, that arrangement would offset flight costs—father would buy two round-trip tickets to mother's three—and would allow the children to be part of father's life in Portland. Pursuant to mother's proposal, the children would stay with father for a few weeks each summer, and the parties would evenly divide

holidays, including three-day weekends. Mother further testified that the short duration of the flight between Portland and San Francisco would not hinder regular contact between father and the children.

Mother also raised concerns about father's judgment in exposing the children to material that mother considered inappropriate given the children's ages. Specifically, mother raised concerns about father's decisions to expose the children to violent movies and music.

Father's proposed parenting plan, on the other hand, did not allow mother to relocate to California with the children, and he alleged that the relocation would diminish his role in the children's lives. Father did agree with mother that the alternating weekend schedule should be maintained, but he also sought midweek parenting time. Father acknowledged that, even before the parties separated, his work schedule conflicted with the children's schedules, limiting his contact with them. However, father testified that he was confident he could get two weekends off per month "without a problem."

Father acknowledged that the longest time he had watched the children alone—without the assistance of mother or her parents—was two consecutive days, and that he did that on an irregular basis, maybe five times in a year. When questioned about how his schedule of 12-hour shifts affected his potential parenting time availability, father agreed that his shifts left him unavailable to watch the children for large blocks of time each week; with day shifts, father agreed that he was unavailable for parenting time at all, and with night shifts, father agreed that he had only a few hours in the afternoon available for parenting time. Nonetheless, father's proposed parenting arrangement included alternating weekends as well as alternating midweek visits, with flexibility in the parenting plan to accommodate father's work schedule.

Father testified to having a very close relationship with A, a bond they shared since A's birth. Father testified that he was a very "hands on" parent with A, teaching A to ski, playing video games with him, taking him out for doughnuts on Saturdays, and tutoring him in spelling and math.

Father testified that his relationship with K was still developing. Father estimated that, during the parties' marriage, the division of parenting duties was nearly equal—mother handled roughly 60 percent of the parenting duties and father the remaining 40 percent. Father also testified that he rarely used the parties' nanny as a babysitter; instead, he usually sent the nanny home early if mother was not home and he was alone with the children. On evenings when father was not working, father testified that he cooked dinner for the family.

In response to mother's concern that he exposed the children to age-inappropriate materials, father testified that, in retrospect, some of the movies he took the children to were probably inappropriate. He also acknowledged that, while home with the family, he spent significant time on individual pursuits, including exercising, woodworking, and crossword puzzles (as many as five per day). Father admitted that he spent more time on those activities in the eight months or so before the parties separated because he "felt sort of alone."

Regarding his relocation concerns, father testified that mother's family was hostile toward him and his parents. Father feared that, if the children lived with mother's brother, they would pick up on negative feelings mother's family had toward father and distance themselves from him. Father also felt that his parental role was threatened by mother's brother, with whom A had a close relationship. Further, father testified that the relocation of mother and the children to California would preclude his midweek visits with the children, his attendance at parent-teacher conferences, and his skiing with A.

Father acknowledged the bond between mother's parents and the children and that mother's culture is family oriented. For example, when A was born, the parties both worked full time and lived with mother's parents, and father testified, "I thought they did a pretty good job raising [A]."

The parties agreed to a custody and relocation evaluation by Dr. Zvi Strassberg, a licensed psychologist. The parties stipulated to the admission of Strassberg's detailed evaluation, which ultimately recommended that mother have sole legal custody but that she not relocate to California

because a move was not in the children's best interests. According to Strassberg, because the children's basic needs were being met in Oregon, moving to California was unnecessary.

Strassberg reported that both A and K were happy and healthy children. Although Strassberg noted that both parties were concerned about A's emotional well-being, he indicated that A's therapist described A as a "fundamentally healthy child who [wa]s adjusting to divorce" and noted that his observations were consistent with the therapist's findings. According to Strassberg, the therapist also commented that A had "not reported hearing anything negative from either parent about each other," but the therapist was concerned about age-inappropriate materials that A reported watching with father. "More recently," Strassberg noted, "[A] ha[d] shown signs of extreme separation anxiety from his mother," and Strassberg testified that A seemed overly attached to his mother. At the time of Strassberg's report, "[A's] separation anxiety issues ha[d] not resolved, but parenting time seem[ed] to be going well at th[at] point with shorter and more frequent occasions." Strassberg observed K to be "a happy, enthusiastic three year-old girl. * * * Neither parent saw [K] as being particularly affected adversely by the family situation until recently, when there [were] times when she ha[d] been upset and wanted to call her mother when on parenting time with her father."

Strassberg's report also analyzed each of the ORS 107.137(1) factors that trial courts are to consider in making child custody and relocation decisions. As Strassberg summarized,

"[A] and [K] are fortunate to have two parents they love, and who love them. It is very unfortunate that there have been such hurt feelings and emotional distress between the parents, as well as among the extended families. The emotionality of the family situation continues, and includes the extended families. Although [mother's family] seem to have made progress in this regard, it may be that all of the adults would benefit from enhanced coping and reconciliation therapy; which can only be helpful to the children.

"In this vein, this study is primarily about the children. If the central decisions to be made concerned only custody and parenting time, the solutions would be relatively straightforward. [Mother] has been their primary caregiver, and has done a capable job. She has had help from her parents and the family nanny, as well as from [father], but her role as primary caregiver is appropriate to an award of sole legal custody. [Father] has played a supporting role with the children. The parents had an agreement that resulted in [father] being the primary wage-earner and thus [he] was out of the home much more than [mother], who worked far less. There was conflicting information as to [father's] amount of involvement with the children. It seems reasonable to conclude that prior to the separation he was as available as a typical full-time working father, that he participated with the children less than his fully available time, and is an individual who seems to need his individual pursuits (*e.g.*, crossword puzzles, woodworking, exercise) sometimes to the deferral of parental participation, but participated with the children regularly for significant periods on his available days. His level of participation would be consistent with the award of regular structured parenting time, albeit with some flexibility in the schedule because he cannot always assure a predictable scheduling of shifts.

"Quality of parenting time, as opposed to quantity, is also an issue. Both children are clearly attached to [mother]. [A] is attached to his father, but this seems less clear for [K]. [Father] has focused his parenting/relationship energies on [A] until recently, but as [K] has gotten older and more able to do fun and active things, [father] has become more engaged with her; and [mother] stated that [K] had been enjoying their time together (albeit with some separation problems). This, in conjunction with parenting time alone with [father] (*i.e.*, without her mother), appears to have facilitated father-daughter bonds. [Father] appears well intentioned and certainly loves his children, but the fact that [K] had to be 'old enough' for him to include her more in his energies suggests the need for developing more child-centered capacities. This point does not obtain across-the-board, as he does join with the children over cartoons and movies, for example, and plays games and knows about [A]'s friends from their conversations.

"* * * * *

"[Father] has strengths that can foster positive relationships with the children, in his capacity to have active and creative fun with them, with his bright and curious mind he can be a terrific educational resource, and skiing has been one of [A]'s favorite activities (and [father] has reported he plans to take [K]).

"There are other issues of [father's] parenting that also need consideration regarding allotment of parenting time and potential help to benefit him (and thus the children), regardless of where the children ultimately reside. That is, the children will presumably have parenting time with him regardless of where they live, and in this sense [father's] deficits or flaws are issues independent of whether they live in Oregon or California.

"* * * * *

"[T]here is support for the idea that [father] makes some poor parenting decisions. In particular, he exposes the children to inappropriate and potentially frightening entertainment. He also places too much responsibility on [A], such as to watch [K] in the morning while he sleeps (seemingly for about 1/2 hour after the children awake), and which [A] does not like. He also allows [A] to put her to bed. [Father] states that [A] says he wants to do this, and so he lets him. However, [A] is a child and is being placed in an adult role; and [father] apparently fails to see the opportunities wasted by not being the one to nurture the children and help them feel safe in his care by reading and tucking them in at night. He also appears to instigate discussion about stressful topics with [mother] in the proximity of the children, suggesting an insensitivity to the potential effects on them. Of course he contends that [mother] yells at him around the children, but there is not evidence that this occurs.

"* * * * *

"To summarize to this point about parenting time, [mother] does not appear to display liabilities that would indicate the desirability of increasing proportional time with [father]. [Father] displays strengths that will benefit the children, but also has seemed limited in his abilities to be child-centered and nurturant, although there do not seem to be a pattern of issues of child safety involved. Despite his limitations, he has shown the capacity to learn and change, and

would likely benefit from a parenting coach to expand his capacities with the children further."

Turning to the issue of relocation, Strassberg opined that "there does not seem to be a need for [mother] to move." In Strassberg's view, although, "[i]n California, the children would have ready access to their close family on an ongoing basis, for special events (*e.g.*, birthdays), and for alternate care when [mother] needs to work," "the simple distance poses an issue." Strassberg reported that the children "love their relatives, and would be quite happy to be with them a great deal" and that there was "no evidence supporting [father's] concern" that "immersion into [mother's] family and the Indian community to which they belong would forever marginalize [father] from the children's lives." However, Strassberg went on to explain his concern that the relocation would disrupt father's contact with the children:

"Although [father] is able to afford the travel he cannot always assure a regular schedule because of his job. In addition, a body of literature indicates that distance between the non-custodial parent and the children leads to reduced contact over time. In this vein, the children would have activities and events that may affect their interests in getting on a plane to come to Portland for a weekend or Spring Break or blocks of Summer time, where they would not have friends. Conversely, presumably [father] could bring them to those activities/events in the Bay Area, when he is there for parenting time. Nevertheless, when the children get older, they will experience normal developmental pulls toward peers that could create a great deal of tension and divided loyalties for them, with risk for reduced contact with their father if and when they do not want to miss events and people from their ongoing lives in order to travel to Portland—or even if he visits there. * * * Despite his current limitations, it is easy to see [father] making significant contributions to the children's intellectual curiosity and achievement, life ambitions, self-esteem, and physical fitness."

Strassberg was also concerned that permitting mother to move to California with the children would severely jeopardize father's chance for a healthy bond with K in particular in the future:

"Albeit probably due to [father's] own choices, the father-daughter bond seems to have been somewhat lacking. [K] has only recently begun showing strong signs of bonding to her father, and him to her, with increased contact. It would seem to be inevitably disruptive of the developing bond to have [K] move and deprive father and daughter the opportunity for regular contact and relationship-building. Put differently, emotional bonds would have trouble developing via air travel."

Strassberg also stressed the importance of regular contact between father and A "to maintain their relationship in the wake of [A's] intense separation anxiety." Strassberg opined that, for A, there would be "potential for significant resistance to parenting time" if A did not see father "with the relative regularity to which he was once accustomed."

At the hearing, however, Strassberg agreed that mother's proposal did not differ significantly from his, except that he recommended alternating midweek visits, which relocation would preclude. Strassberg also testified that, although his report was limited in its content of cultural considerations, he agreed that the children's connection with their Indian culture was important.

In a letter opinion, the trial court adopted Strassberg's factual findings regarding the ORS 107.137(1) factors, but ruled that it could not interfere with the parties' MSA as to parenting provisions, which permitted mother to move outside of Oregon with the children. With regard to mother's employability, the trial court noted that

"[t]here is a question whether [mother] is employable here. She has interviewed all of the hospitals in the area, just as husband said she should do, including the ones that husband said were hiring. She has had no offers of employment. Susan Martin, a vocational consultant, was interviewed and found that there should be jobs here, but again these were places that wife had already tried. There is no proof that she is employable in this area; I find that very surprising, but I have wife's factual statements on one side and opinions on the other."

Ultimately, the court dissolved the "ad hoc order requiring wife to remain here with the children," and ruled that mother "may move immediately."

Father unsuccessfully sought to stay mother's relocation, and mother and the children moved to California within a week of the trial court's order. The parties then requested that the trial court make "best interests findings" regarding relocation pursuant to ORS 107.137(1). In a supplemental letter opinion, the trial court addressed each of the ORS 107.137(1) factors and concluded that relocating to California with mother was in the children's best interests.

On appeal, father contends that the trial court erred in enforcing the parties' agreement "as if it were a valid [MSA]" and that the court erroneously allowed mother's relocation to California when it "was overwhelmingly not in [the children's] best interests." In response, mother contends that, "notwithstanding the trial court's antecedent remarks regarding enforcement of the MSA, the trial court permitted the best interests question to be fully presented below." (Internal quotation marks omitted.) Mother's argument emphasizes that,

"[w]here, as here, the trial court is requested to develop a 'detailed parenting plan,' even though the parties executed a MSA containing a relocation provision, 'the focus is on the question whether the children are "better served" by relocating' and 'the safety of the parties.' ORS 107.102(4)(b)[;] *Cooksey* [*and Cooksey*], 203 Or App [157,] 172[, 125 P3d 57 (2005)]."

In that regard, mother contends that we should affirm the trial court's decision concerning relocation in light of the court's best interests findings.

Although husband contends that the trial court erred in enforcing the terms of the MSA, on appeal the parties agree that the question of relocation is ultimately predicated on a best interests analysis. Thus, as amplified below, because we find that mother's relocation to California with the children is in their best interests, we need not resolve husband's contention concerning the enforceability of the MSA.[2] Accordingly, we turn to the dispositive issue on

_____

[2] As noted, the trial court initially ruled that it could not interfere with the MSA because it reflected the mutual child-rearing decisions of fit parents, decisions presumed to be in the children's best interests. It appears from the record that the trial court's deference to the MSA was grounded in its belief that *Troxel v.*

appeal, that is, whether, on *de novo* review, relocating to California is in the children's best interests.

In making that determination, "we examine the factors identified in ORS 107.137(1), along with the legislative directive to promote strong relationships between children and their noncustodial parents." *Cooksey*, 203 Or App at 172. In reviewing the trial court's findings that "involve considerations of credibility and demeanor, we do so cautiously, reversing only for clearly articulable reasons." *Id.*

ORS 107.137(1) provides the factors relevant to our analysis, specifically:

"(a)   The emotional ties between the child and other family members;

"(b)   The interest of the parties in and attitude toward the child;

"(c)   The desirability of continuing an existing relationship;

"(d)   The abuse of one parent by the other;

"(e)   The preference for the primary caregiver of the child, if the caregiver is deemed fit by the court; and

"(f)   The willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child."

No single statutory factor is dispositive.

Our analysis is also informed by the legislative directive to, in reviewing a parenting plan, "recognize the value of close contact with both parents and encourage, when practicable, joint responsibility for the welfare of [the] children and extensive contact between the minor children of the divided marriage and the parties." ORS 107.105(1)(b). Further, we are mindful of Oregon's public policy preference to "[a]ssure minor children of frequent and continuing contact with parents who have shown the ability to act in the best

*Granville*, 530 US 57, 120 S Ct 2054, 147 L Ed 2d 49 (2000), extends constitutional protections to custody and relocation agreements made by parents in a dissolution case. Although the trial court gave preclusive effect to the MSA, the question of its weight in a relocation case is not one that we need to resolve in this case.

interests of the child," ORS 107.101(1), and to "[e]ncourage such parents to share in the rights and responsibilities of raising their children after the parents have separated or dissolved their marriage," ORS 107.101(2).

We have applied those statutory factors and public policy preferences in several cases involving relocation of the custodial parent. *See Herinckx and Matejsek*, 231 Or App 50, 218 P3d 137 (2009); *Fedorov and Fedorov*, 228 Or App 50, 206 P3d 1124, *rev den*, 347 Or 42 (2009); and *Cooksey*, 203 Or App 157. Because those cases inform our analysis here, we discuss them in some detail.

In *Herinckx*, we reversed the trial court's determination that the mother's relocation from Klamath Falls to Chicago was in the child's best interests. 231 Or App at 52. In that case, the custody evaluator "preferred" that the mother retain custody but believed that it was not in the child's best interests for the mother to move with the child to Chicago. *Id.* at 54. The father argued that, "if the child moved to Chicago, [the child's relationship with the father] would suffer because of the loss of regular, frequent weekend visits." *Id.* at 55. The trial court, however, found that relocation was in the child's best interests and reasoned that termination of the child's positive relationship with mother's boyfriend—whom mother testified she would not continue dating if she could not move to Chicago—would "adversely affect a significant part of [the child's] life." *Id.* at 55 (alteration in original). On *de novo* review, we concluded:

> "Moving the child to Chicago inevitably would detrimentally affect the child's relationships with father's wife, mother's family, and, most significantly, with father, who would lose frequent, regular parenting time, although he would continue to have the same total amount of parenting time. * * * [W]e cannot conclude that the potential loss of the child's relationship with [mother's boyfriend] is so detrimental as to outweigh the inevitable damage to all of the child's other relationships, especially her relationship with father. In short, we cannot conclude that the child's best interests are better served by moving to Chicago than by remaining in Klamath Falls."

*Id.* at 57-58.

In *Fedorov*, we affirmed the trial court's determination that permitting the mother to move with the child from Oregon to Australia was not in the child's best interests. In that case, we agreed with the father that the custodial parent, the mother, did not have a presumptive right to relocate with the child, and the mother's move had to satisfy the best interests standard. 228 Or App at 61-62. The evidence demonstrated the strength of the relationships between the child and each parent, and we agreed with the trial court's findings that the father had "taken virtually all opportunities to be with his child when he [wa]s able to do so" and that "the geographical distance involved in a move to Australia * * * would make unrealistic any frequent contact between father and the child." *Id.* at 59 (internal quotation marks omitted). We rejected the mother's argument that, because the move to Australia would make her happier and thus a better parent, the move was in the child's best interests. Instead, we concluded that the child's best interests "are determined by a broader evaluation of the child's interests in the context of the post-divorce family." *Id.* at 65. We noted that the record did not contain evidence of how the proposed move to Australia would benefit the child and that "nearly all of the benefits that mother describe[d] [we]re benefits to her." *Id.* at 64. Therefore, we held that the "mother did not meet her burden" of showing that her modification to the parenting plan was in the child's best interests. *Id.* at 65.

Similarly, in *Cooksey*, we affirmed the trial court's determination that the mother's proposed move from Coos Bay to Klamath Falls was not in the child's best interests. 203 Or App at 174. The factors that drove our analysis in that case were the distance between the two locations and the lack of evidence supporting how the move would benefit the child. *Id.* at 173. First, we noted that the father was "especially close to [the child] and ha[d] been continuously involved with the child's upbringing from infancy onward." *Id.* at 172. The distance between Coos Bay and Klamath Falls—a nearly five-hour drive one way—was "far enough away," we found that it would "significantly—and adversely—alter the nature of father's contacts and, hence, his relationship with [the child]." *Id.* at 173. Second, we agreed with the custody evaluator that the record was devoid of evidence "that the move

to Klamath Falls would benefit [the child] in any way." *Id.* In that regard, we concluded:

> "the facts of this case are materially indistinguishable from those in *Willey and Willey*, 155 Or App 352, 963 P2d 141 (1998). As we noted, in that case, both parents were loving and actively involved in the upbringing of their child. The child, in turn, was closely attached to both parents. The mother wished to relocate to be close to her own family. The father objected that the move would adversely affect his relationship with the child. We concluded that there was no evidence showing that the child would actually benefit from the proposed move and, on that ground, affirmed the trial court's decision to restrain mother from relocating with the child. 155 Or App at 355 ('Wife does not demonstrate how the child's best interests are served by her plans for the move.')."

*Id.* at 173 (brackets omitted).

On the other hand, there are other cases in which we have concluded that it was in the best interests of the children to remain with the custodial parent, despite that parent's intent to move away from the noncustodial parent. For example, in *Hamilton-Waller and Waller*, 202 Or App 498, 501, 123 P3d 310 (2005), the father sought a change in custody from the mother to him because of the mother's intention to move with the children to Holland. We held that the move was in the children's best interests, noting that there was evidence regarding how that mother's relocation to Holland would benefit the children, including enhanced educational opportunities for both children and better resources available to the child with special needs. *Id.* at 518-19. We concluded

> "that it is in the best interests of the children to remain in the custody of their primary caregiver, mother, even if she decides to move to Holland. Ideally, the children would have the benefit of an extensive and strong relationship with both parents and all of their extended family. As mentioned above, the effect on the noncustodial parent's involvement with his or her children makes this type of case one of the most difficult that this court must deal with. It is regrettable that father, who obviously loves his children and wishes to spend time with them, will be limited in his

parenting time and that the children may suffer some detriment from the adjustments that they will need to make if they move with mother to Holland.

"On balance, however, we believe that it is in the children's best interests to remain with mother. She has been their primary caregiver and she is the parent with whom they have the most extensive relationship. She has clearly demonstrated that she has the willingness and ability to meet all of their needs. * * * Should mother decide to move, she has indicated that she will make sure that the children communicate often with father by e-mails and telephone and have as many visits as possible. Mother should make every effort to do so and to take other actions to ensure the continued relationship between father and the children."

*Id.* at 521.

In so holding, we reversed the trial court's decision that the mother would retain custody only if she did not move to Holland. *Id.* at 501. The trial court's determination was consistent with the recommendation of the custody evaluator, and the dissent questioned the majority's lack of deference to the trial court's finding that the evaluator was persuasive given that the trial court had the opportunity to observe and assess the evaluator's demeanor. *Id.* at 525. We held, however, that the custody evaluator's report, although a critical part of the record, was "not necessarily determinative," and that, on *de novo* review, we "remain free to exercise [our] judgment based on all of the evidence in the record." *Id.* at 520. We gave the evaluator's report less weight than the trial court gave it, in part, because of the evaluator's "fairly limited experience" and her limited exposure to the family. *Id.* at 520-21.

In *Colson and Peil*, 183 Or App 12, 14, 51 P3d 607 (2002), the father, the noncustodial parent, sought a change in custody because of the mother's plan to move with the children to Missouri. The trial court granted the father's request for change of custody, reasoning that the mother's proposed move to Missouri was more about pursuing her goals than providing consistent parenting to the children. *Id.* at 20-21. We reversed and concluded that it was in the children's best interests for mother to retain custody, even if she moved. *Id.* at 24. We found that

"the son [wa]s resilient and could benefit from a change in school environment, that the daughter loves ballet and w[ould] be better able to fulfill her potential as a dancer in Missouri, and that mother has a strong support network in Missouri that will encourage her career and personal development in the wake of the dissolution. Moreover, the record reflects that father's family also lives in Missouri and that father is willing, albeit reluctantly, to relocate to Missouri if mother and the children move there."

*Id.* at 23.

Ultimately, our review is fact driven; thus, with the above principles in mind, we return to the facts of this case. As noted above, Strassberg analyzed the ORS 107.137(1) factors, and the trial court addressed each in its supplemental opinion. Although the parties agree that those factors drive the analysis, they contend that the facts dictate opposite outcomes. Father argues that moving to California is not in the children's best interests and cites three major disadvantages to relocation that were identified by Strassberg: (1) the distance between Portland and the Bay Area would reduce the frequency of physical contact between father and the children; (2) reduced contact would disrupt K's "developing bond with her father"; and (3) "the distance between the two households would exacerbate the growing anxiety suffered by A." Father also argues that mother has not demonstrated how the move will benefit the children; rather, according to father, her testimony emphasized that the move is convenient for her. Mother, on the other hand, contends that the factors weigh in favor of relocation not only because she will be able to work, as the parties agree that she must, but also because of the children's close connection to her family and the expanded opportunity in California for the children's cultural and religious growth within Dublin's large Indian community.

Mother also contends that the relocation will not meaningfully reduce the frequency of contact between father and the children. Mother points out that unlike the nine-hour round-trip drive in *Cooksey* or the flight to Australia in *Fedorov*, the flight between Portland and the Bay Area is only about one and one-half hours. Moreover, father already

sees the children on alternating weekends and mother's proposed parenting plan does not reduce that contact time. Therefore, mother asserts, "there is a complete lack of evidence demonstrating that the geographic distance would interfere financially or time wise with Father's ability to maintain frequent contact with his children, given the constraints of his work schedule."

Mother further contends that her move "is not optional." Unlike the custodial parent in *Herinckx*, mother's move is motivated not by a desire to follow a new relationship, but by the necessity to find a job and a "better quality of life for the kids."

Applying the statutory factors, we conclude that the children's best interests are served by moving with mother to California. First, we find that mother is the primary caregiver and has been throughout the children's lives. There is no question that she is a fit parent, and the children are bonded more to her than to father. ORS 107.137(1)(e). Although both parties love the children, mother's interest in and involvement with the children has been more constant and complete than father's. As Strassberg reported, father "has seemed limited in his abilities to be child-centered and nurturant," and he has not fully utilized his available time to be with the children. Thus, we conclude that the preference for the primary caregiver, ORS 107.137(1)(e), and the relative interests of the parties in and attitude toward the children, ORS 107.137(1)(b), weigh in favor of relocation.

Second, we consider the emotional ties between the children and other family members, ORS 107.137(1)(a), and the desirability of continuing existing relationships, ORS 107.137(1)(c). The parties agree that mother needs to return to work. We find, as did the trial court, that mother has been unable to find work in Oregon, but has found a position in California. The children will benefit from the move not only because of mother's employment but also because it will bring them close to their extended family, including father's parents, mother's brother's family, and, in the near future, mother's parents, who have spent significant time with the children. Proximity to their extended family is particularly important to the children as mother returns to work, which

will affect the children's schedules and routines. That transition will be easier for the children in California, where they can stay with mother's brother's family, including their cousins, who are "like brothers and sisters," and soon, their maternal grandparents, who have helped to raise them. Moreover, in California, the children will be better able to continue their cultural and religious growth, given the large Indian community to which they have already established ties. Thus, the move has significant benefits not only for mother, but also for the children. Of course, it also has the significant disadvantage of increasing the geographic distance between father and the children. But we find that that disadvantage is mitigated, in part, by the fact that, under mother's parenting time proposal, father's parenting time will continue as it has, and mother is willing to increase father's parenting time as the children grow older and are more comfortable spending longer periods of time with him. We also note that, in this case, the travel time is not a barrier to father's parenting time given his ability to schedule his time off, nor are the travel expenses, given both his own financial resources and mother's willingness to share the children's travel expenses. Therefore, we conclude that the children's emotional ties with other family members, ORS 107.137(1)(a), weighs in favor of relocation, as does the desirability of continuing existing relationships with those family members, but the desirability of continuing their relationship with father weighs against it, although that factor is mitigated by the fact that father's parenting time can continue as it has.

Finally, we consider the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the children.[3] ORS 107.137(1)(f). Given that the parties agree that mother should have custody of the children, we focus on whether she will encourage the children's relationship with father, and we find that she will. We find persuasive mother's testimony that she respects father's role in the children's lives and purposely designed a parenting arrangement that closely

---

[3] The abuse of one parent by the other, ORS 107.137(1)(d), is not implicated on this record and therefore not a factor in our analysis.

resembles the plan the parties have followed since their separation and includes significant time and financial obligations on her part to ensure that the children spend time with father in both California and Oregon. Thus, applying the ORS 107.137(1) factors, we conclude that the children's best interests are served by their relocation to California with mother.

We recognize the statutory requirement to encourage "extensive," ORS 107.105(1)(b), and "frequent and continuing," ORS 107.101(1), contact between both parents and their children. And, we appreciate Strassberg's concern that physical distance leads to reduced contact and that, as the children's California-based activities increase, flying to Oregon every third weekend and on school breaks might be an inconvenience for the children. For now, however, in light of the parties' ability to afford and utilize air transportation, mother's relocation to California is not materially distinguishable from a hypothetical scenario in which mother is hired to work in Eugene and wishes to move there with the children (assuming the parties' families were there as well). In that hypothetical situation, father would have to drive nearly two hours to visit, a distance that would similarly impede mid-week parenting times. Thus, in this case, the distance factor does not militate strongly against relocation, given father's work schedule and financial means.

Finally, it is not our intention that this parenting arrangement "punish" father, as he suggests, for his demanding work schedule or for not spending all of his nonworking hours with the children. Rather, allowing the children to move reflects what is in their best interests, given the nature of their relationships with the parties and other relatives; the childcare, cultural, and religious benefits that will come with the move; and the fact that, despite the increased geographical distance between father and the children, father can continue to have significant, frequent contact with the children.

Affirmed.