Shawn Michael SJOMELING,
*Petitioner-Appellant,*

*v.*

Christina Louise LASSER,
*Respondent-Respondent.*

Washington County Circuit Court
C053201DRA; A143871

285 P3d 1116

George W. Kelly argued the cause and filed the brief for appellant.

David N. Hobson, Jr., argued the cause for respondent. With him on the brief was Hobson & Angell, L.L.P.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

DUNCAN, J.

**DUNCAN, J.**

Father appeals a supplemental judgment modifying the parties' parenting plan to allow mother to relocate with the parties' two children from Oregon to Utah. On appeal, father contends that the trial court erred in determining that the children's best interests are served by the relocation. As amplified below, we conclude that the trial court did not abuse its discretion in determining that relocating to Utah is in the children's best interests. Accordingly, we affirm.

We are bound by the trial court's findings of fact if there is any evidence in the record to support them. *Kirkpatrick and Kirkpatrick*, 248 Or App 539, 541 n 1, 273 P3d 361 (2012). Accordingly, deferring to the trial court's express determination that the testimony of mother and her witnesses was credible, we state the facts consistently with the trial court's express and implied findings, supplemented with uncontroverted information from the record. *Id.* at 541.

Mother and father, who were never married, have two children. In early 2009, at the time of the hearing concerning the proposed relocation, their son, SJ, was seven years old, and their daughter, SA, was five years old.

Initially, the parties—and their children, after they were born—lived in California. Before the children were born, while the parties were living together, father was arrested and convicted of assaulting mother. Although father was again arrested for assaulting mother in 2004, he was not convicted. With regard to that incident, mother explained that, at father's request, she signed a declaration calling into question aspects of the police report. Specifically, mother testified that the declaration "gave question to what was in the police report, saying that maybe he didn't kick me, maybe it was a chair that fell on me, maybe the door was busted off the hinges because the hinges were bad, not because of pushing out the door, things of that nature."

Eventually, in June 2005, mother moved with the children to Oregon. Mother helped father move nearby a few months later but indicated to him that their romantic relationship was over. Father settled in Vancouver, Washington. The parties had an informal agreement that

mother would retain custody of the children and father would have parenting time. Mother testified that father would see the children "for a night or two every week, every other week. It was rather sporadic."

In October 2005, an incident occurred during one of father's visits that caused mother to leave the state with the children. In the two or three days before the visit, SA—who was about a year old—had been sick and had been to the doctor for antibiotic injections. On the day of the visit, SA was scheduled to go to the doctor again. Mother initially suggested that father cancel the visit because SA was sick, but she ultimately agreed to the visit after father agreed to take SA to the doctor. When father did, the doctor recommended that SA go to the hospital. Father called mother and told her that he was taking SA to the hospital, but he would not tell her which hospital. Father also told mother that he would not be returning the children to her. Mother called local hospitals but could not find SA because father had restricted the release of SA's information. Mother also called the police and an attorney. The next day, mother was able to determine where SA was, and she went to the hospital and found SA, who was ready to be discharged. Mother held SA in her arms and refused to release her to father. Tensions mounted between mother and father. Eventually, hospital security, child services, and the police responded. To resolve the conflict between the parties—who, as noted, had only an informal custody agreement at that time—the police allowed mother to retain SA, whom she was holding, but allowed father to take SJ.

Although father had previously only had short visits with the children, he kept SJ, who was about two and one-half years old. After 10 days, mother went to father's home and pushed her way past father's wife to retrieve SJ. Thereafter, she took both children to California and then to Utah. For approximately six months, mother ensured that father had no contact with the children. However, mother testified that, during that period, she had one conversation with father in which he "said something very threatening and alarming to me, basically implying that if I were dead, he would automatically have custody of the children."

Mother was eventually arrested in Utah, and the children were placed in father's care for approximately three months. Mother ultimately pleaded no contest to two misdemeanor criminal charges in Washington, custodial interference in the second degree, RCW 9A.40.070, and criminal trespassing in the first degree, RCW 9A.52.070. Except for the three-month period that the children were in father's care, mother has had custody of the children and has functioned as their primary parent.

In 2007, the parties' informal arrangement had been replaced by a formal parenting plan in a stipulated judgment. In general, under that plan, father had parenting time every other weekend, alternating holidays, and for a period in the summer. Since the 2007 plan has been in effect, father has regularly exercised his parenting time.[1] Among other things, he and the children spend their time together camping, fishing, and playing games.

Nevertheless, at times, father has demonstrated an unwillingness to perform parenting tasks during his time with the children. For example, in May 2008, father failed to take the children to their dental appointments, which caused a disagreement between the parties that resulted in a complete breakdown in communication.

In caring for the children, mother has received extensive financial and emotional support from her extended family, including her parents, who lived nearby in Oregon but moved to Utah eight months before the hearing.[2] At the time of the hearing, mother and the children lived in a small apartment in the Portland area. Although mother worked part time at various positions including waitressing, her annual earnings had never exceeded $12,000 and she never

---

[1] Although mother has not interfered with father's parenting time, she has not always facilitated phone contact between father and the children and does not always respond to father's e-mails.

[2] In addition to mother's parents, mother's sister and niece lived in Oregon, as did her brother and sister-in-law. In the months preceding the hearing, those family members moved away. According to mother, after her extended family left the Portland area, it was "kind of difficult or lonely. I kind of feel like the kids' lives aren't as full on a day-to-day basis as far as having regular people [who] are that close to them involved."

independently made a salary sufficient to support herself and the children.[3]

For that reason, mother's parents consistently supplemented her income.[4] On average, mother's parents have given her approximately $750 each month to help her support the children. Although they intend to continue that support as long as possible, mother's father, Lasser, has been diagnosed with stage four non-Hodgkin's lymphoma, which is incurable and will likely necessitate his retirement within a couple of years.

Moreover, mother's extended family provided, in effect, a safety net for mother and the children that served to buffer stressful events. For example, Lasser testified that there were times when father "[went] out of his way to be uncooperative" and suddenly canceled his parenting time or failed to pick up the children so that mother could go to work. In order to prevent mother from losing her job, Lasser testified that, on more than one occasion, his wife had had to "run to Portland to baby-sit [at the] last minute." Because mother's parents lived nearby and were involved in the children's care, the children saw their grandparents often and are bonded to them.

Although mother had at least one serious personal relationship after moving to Oregon, she never married. Father, on the other hand, married in 2006. At the time of his marriage, his wife had a son from a previous relationship, and, by the time of the hearing in this case, father and his wife had two children together—a daughter who was three years old and a son who was one year old.[5] Because

---

[3] According to mother's father, mother's employment difficulties were, in part, attributable to a lack of cooperation between mother and father regarding childcare.

[4] Father, who is employed full time in the construction industry, is also obligated to pay mother $473 in child support each month. However, at the time of the hearing, he owed mother support arrearages of approximately $1,000, which he was attempting to repay in $94 monthly installments.

In addition to assistance from her parents and child support from father, mother has received financial assistance in the form of reduced tuition and program fees for the children's daycare and recreational activities.

[5] Father also has another daughter from a former relationship. She was approximately 12 years old and lived in California at the time of the hearing. Although father pays child support for his daughter, he does not have parenting time and does not have a close relationship with that child.

father regularly exercised his parenting time, SJ and SA are bonded to him as well as his new wife and their siblings.

Bluntly, mother and father's relationship is acrimonious, as is mother's relationship with father's wife. A detailed recitation of the parties' grievances and the points of conflict is unnecessary in this context. It is sufficient to note that they often have major conflicts about minor issues that last for months. In the words of the trial court, mother and father's relationship is a "high conflict" one.

Although the parties' contentious relationship has not resulted in further abuse against mother, in February 2008—approximately a year before the hearing in this case—father was convicted of assaulting a female friend.[6] That assault—and father's subsequent arrest—occurred during his parenting time, while the children were asleep in another room, after father and his wife had been out drinking with friends.

Because father was in custody and unavailable to take the children home, father's wife e-mailed mother and asked her pick up the children. Father's wife did not tell mother about father's arrest because she felt that mother "didn't need to know about it" and "[b]ecause [she] had a feeling [that mother] would use it against [them]." Further, when asked whether she would want to know if her children were in the care of someone who was drunk and who had been arrested for assault, father's wife replied:

> "I would want to know about it, but I wouldn't expect my ex-husband to tell me about it. In fact, he hasn't before. He's been arrested in front of my son before and I just accept that he's his dad and if I find out things, I find them out, and I go to the courts if I have to if I feel that my son is in danger and take care of it that way. I don't expect him to tell me because I know he's not going to."

Father acknowledges that his abusive behavior was caused, at least in part, by his alcoholism. Specifically, father testified, "I broke the law, I drank, I was mentally, physically, abusive * * *." However, by May 2008, father testified that

---

[6] At the same time, father was arrested for assaulting his wife, but those charges were ultimately dismissed.

he had "decided to quit all that." Specifically, father testified that he stopped drinking and that he is in counseling and regularly participating in various programs—including Alcoholics Anonymous—that have helped him learn "[h] ow to live life, how to handle problems, conflict resolution, communication, [and] forgiveness of others." Father's pastor testified that father and his family attend church regularly and that the quality of father's parenting is "on the rise."

As previously noted, mother's parents moved to Utah approximately eight months before the hearing in this case. Shortly after they moved, mother notified father of her intent to relocate with the children to Utah, and she filed a motion to show cause why the parenting plan should not be modified to allow her to do so. In response, father filed a motion opposing the relocation and seeking to change custody of the children, which mother opposed.

Significantly, at the hearing concerning the parties' motions, father clarified that he was seeking custody of the children only if mother were to move without them, which mother said she would not do. For that reason, the focus of the hearing was on mother's motion to modify the parenting plan.

In that regard, mother explained that relocating to Utah is in the children's best interests for two interrelated reasons. First, mother had received an offer to become a print broker with a Utah-based company that produces family films. A print broker is primarily responsible for outsourcing the company's printing projects. According to Gregory Cope, the film company's vice president, to succeed as a print broker an individual must have "good people skills," an "understanding of print and print media," and a willingness to "roll her sleeves up and work hard." Mother has worked for Cope before, and both he and Lasser believe that mother has those skills.

Lasser, who expects to retire within a couple of years due to his deteriorating health, currently holds the print broker position and would be responsible for mother's training, which he estimated would take about one year. Although Lasser was allowed to telecommute for the company—that is, to work for the company while living

in places other than Utah—Cope testified that allowing mother to telecommute was not his preference. And, Lasser explained that he did not start telecommuting until he had "years of face-to-face experience with the customers and the vendors and everybody else."

Unlike mother's previous part-time jobs, the print broker position is full time. According to Cope, the position has a starting annual salary of between $30,000 and $35,000, which could grow over time to $60,000. As mother explained, this job opportunity would significantly improve her and the children's standard of living and allow her to provide them with opportunities to pursue activities in which they are interested. The move is, in her words, "the first step in just getting a solid standing for the rest of our li[ves]." As Lasser reiterated, "[t]his [job] is an opportunity" for mother; it will provide her with the best opportunity "to stand on her own two feet and make a living for herself and her children."

Second, mother will have the support of her parents as well as other extended family members in Utah.[7] In Utah— as they did when they lived in Oregon—mother's parents intend to provide the financial and emotional support to which mother and the children have grown accustomed and which will be particularly beneficial as mother transitions into full-time employment. According to Lasser, several relatives will be available to provide childcare and, as a result, mother will have lower, if any, daycare expenses.

For example, if mother is permitted to relocate, her parents will allow her and the children to live in a townhome that they own. Once mother is settled and able to make the monthly payments on her own, mother's parents intend to turn the title to the townhome over to mother. As mother testified, the children "love the house" where they would each have a bedroom and a small backyard in which to play.

Moreover, as mother testified, the children have missed their grandparents since their grandparents moved

---

[7] In addition to mother's parents, mother will have the support of other family members in Utah, including another sister and her family and mother's aunt. All of those family members know and care for SJ and SA and will be available to help mother with their care.

to Utah. If mother is allowed to move there, mother's parents will again help care for the children. As mother explained, in Oregon, she transported the children to many of their activities (*i.e.*, "swimming classes, gymnastics, dance class, art class, soccer, tennis"); however, in Utah, even though she would be working full time, the children could continue in their various activities because she would have help transporting them and with other childcare responsibilities.

Unlike mother's parents and extended family, who intend to support mother and the children if they are allowed to move to Utah, father is not in a position to support mother as a parent if she is required to stay in Oregon. As previously described, the parties' contentious relationship has not allowed for positive coparenting. Father candidly acknowledged that, at the time of the hearing, despite his attempts to change some of his own behaviors, he was not yet in a position to cooperatively coparent with mother. Specifically, during the hearing, the following exchange occurred between mother's attorney and father:

"Q.  If [mother] stays here, how are you going to be more supportive to her?

"* * * * *

"A.  I'm just going to keep calling. I'm putting the kids first, no matter what. I put all my selfish wants and desires aside. If I don't believe she is doing something right, I'll tell her about it and that's all I can do. I can't make her do anything.

"* * * * *

"Q.  So she has no family here, right?

"A.  * * * No.

"Q.  *So here she and the children have you, right?*

"A.  *The children have me.*

"Q.  *But [mother] doesn't really have you to support her, to be supportive of her, does she?*

"A.  *No.*"

(Emphasis added.)

Against that evidentiary backdrop, the trial court explained that mother's "proposed move to Utah with the children is intended to improve her standard of living, her residence and her employment and will place her in closer proximity to her extended family." In particular, the court noted that, not only does mother have a "genuine desire * * * to be closer to her father" who "has stage [four] non[-] Hodgkin's lymphoma," but she also has a desire for the children to be closer "to [their grandfather] and grandmother as well."

The court acknowledged how "emotional and difficult" the issues in the case were "for the two parents and for extended family." Further, the court explained that there was no way to reach an "effective[ ] * * * compromise" because "there isn't a way for both parties to succeed in getting what they want * * *."

Ultimately, the trial court determined that it was in the children's best interests to relocate to Utah. Accordingly, the trial court granted mother's motion to modify the parenting plan.

In explaining its ruling, the court noted, among other things, that both mother and father had, at times, "behaved badly and exercised poor judgment." Specifically, the court explained, "Mother has exercised poor judgment in the incident with [SJ]. She behaved badly. She garnered a criminal conviction out of that. I would note it would be this Court's finding, however, that father also behaved badly and exercised poor judgment in that incident with [SJ] and [SA]." Further, the court commented that there are many problems with the parties' relationship. Nevertheless, the trial court found that "[m]other has abided by and large with the parenting order."

The court further explained that it had concerns about father's willingness to perform parenting tasks during his time with the children and his ability to behave appropriately whether or not the children were with him. Apparently referring to father's failure to take the children to dental appointments and the communication breakdown with mother that occurred thereafter, the trial court stated:

"When you are a parent, you are a parent all the time. Parenting time is for the benefit of kids. Parents do things with and for their children during the time that they are parents, which is 365 days of the year. So it is difficult for me to understand doing an occasional errand or taking a child to an appointment as being an imposition on a parent.

"I have some difficulty with that, but just note it is my sense that it is the law of the [S]tate of Oregon that parent[s] are parents all the time and should behave accordingly, whether they are with their children or not with their children."

Relatedly, the trial court expressed concern about father's ability to maintain consistent and positive relationships, explaining that father

"now has five biological children with three different women, never was married to [mother], is married to his current wife but the first child was born prior to the marriage and his first child, who is somewhat older[,] is a child he has no contact with. So, in terms of stability and ability to have consistent positive relationships, it appears to me that [f]ather has shown by behavior that that is difficult for him and will continue to be a challenge."

Moreover, the court rejected father's contentions concerning mother's inability to maintain a stable lifestyle, noting that "some of the things that father brought up in evidence and in argument regarding [the] stability of [m]other are frankly, more true of [f]ather than of [m]other."

The court was also concerned about father's history of domestic violence. Specifically, the court noted father's history "as to mother"—namely, as previously described, 251 Or App at 173, his conviction for assaulting her sometime before the children were born. Further, with regard to the incident in 2008 in which father was convicted of assaulting a female friend, the trial court explained that

"it [was] extremely concerning *** that [f]ather's wife admitted to lying regarding [f]ather's arrest for assault and domestic violence, and that she seemed to view this as acceptable and perhaps even expected behavior. As she indicated that if something like this were to happen with her ex-husband, she would not expect anybody to volunteer

that information and she would simply just go ferret it out somehow."

However, the gravamen of the court's reasoning was that "the stability and employment" of a primary, custodial parent such as mother "is a critical piece of the child's success in life." In that regard, the court explained that relocating to Utah would be in the children's best interests for two interrelated reasons.

First, mother has a "bona fide * * * offer" for a job in Utah, with a starting annual salary of between $30,000 to $35,000 and the potential for growth over time to $60,000. The court explained that the circumstances surrounding mother's job offer were "unique." Specifically, the court stated that mother would "fill a job that her father is vacating due to his health issues" and that "her father is in a position to assist with her training and orientation." According to the court, that job in Utah will improve the standard of living for mother and her children.

Second, mother's extended family in Utah—particularly her parents, to whom the children are emotionally bonded—will provide mother and the children with the financial and emotional support that they need, particularly as mother transitions to working full time in her new position. In particular, the trial court found that mother had been "financially and emotionally very tied to that family in Utah" and anticipated that mother would continue to look to those family members for the support that she needed to provide a stable environment for the children. Significantly, unlike mother's extended family in Utah, the court noted that father was not in a position to "support [m]other as a parent" if she were required to stay in Oregon.[8] As the court explained, mother and father had a "high conflict" relationship and, for that reason, their coparenting had not been "particularly successful." Moreover, the court reasoned that, "without some very significant changes," improvement was unlikely.

---

[8] Specifically, the court stated:

"I would note that [f]ather has made some significant improvements or he's discussed significant improvements, but even in the midst of those improvements he continues to have difficulty articulating any way that he could support [m]other as a parent in any better way, and that is concerning to the Court."

In sum, the court reasoned that "the multiple benefits that are afforded by [m]other's move outweigh the detriment of giving up an alternating parenting schedule to the children." Accordingly, the court granted mother's motion to modify the parenting plan.

Consistently with its oral ruling, the court entered a supplemental judgment modifying the parties' parenting plan to allow mother to move with the children to Utah. Because the school to which mother proposes to send the children is on a year-round schedule, they will be in school for 45 school days and then have 15 school days off. They will also have a four-week vacation in the summer. Because of the children's school schedule, the parenting plan provides, in pertinent part, that father shall receive a total of eight weeks of parenting time each year:

"Father's parenting time shall then be determined by the school breaks and he shall be entitled to up to two (2) weeks during each major school break where [f]ather's two (2) weeks would not exceed two thirds (2/3) of the full school break for a total anticipated number of eight (8) weeks of uninterrupted parenting time each year. If the number of major school breaks meeting these criteria is less than four (4) in any school year, then [f]ather shall be entitled to additional parenting time added to another school break to which [f]ather's total parenting time would not exceed two thirds (2/3) of the total school break in order to ensure that he is able to exercise a total of eight (8) weeks or approximately fifty-six (56) days of parenting time each year."

Further, the parenting plan requires mother to make the children available for phone calls or video chats twice each week. Father appeals.

On appeal, the parties essentially reiterate the contentions that they raised to the trial court. For his part, father contends that the trial court's best interests determination was erroneous for two reasons. First, relying on our decisions in *Herinckx and Matejsek*, 231 Or App 50, 218 P3d 137 (2009), *Fedorov and Fedorov*, 228 Or App 50, 206 P3d 1124, *rev den*, 347 Or 42 (2009), and *Cooksey and Cooksey*, 203 Or App 157, 125 P3d 57 (2005), father asserts that, although mother may have demonstrated that relocating was in *her* best interests, she did not demonstrate

that it was in the *children's* best interests. Second, father asserts that, because his parenting time will be less frequent and because the quality of his parenting time will suffer if the children are with him during the work week rather than on weekends, "the move will not [be] in their best interests."

Mother remonstrates that "[t]he children's interests were better served by the move to Utah" because "[m]other would have greater employment prospects" in Utah and the children "would enjoy the physical, financial and emotional assistance of [m]other's extended family." For those reasons, and because the children's relationship with father can be "adequately *** preserved by the parenting schedule that was ordered[,]" the trial court correctly "ruled that[,] in this high conflict case[,] the multiple benefits that are afforded by [m]other's move outweigh the detriment of giving up an alternating parenting schedule to the children."

In determining whether to modify a parenting plan to allow a custodial parent to relocate with a child, the trial court "may consider only the best interests of the child and the safety of the parties." ORS 107.102(4)(b). Before examining the legal principles that govern that determination, we begin by identifying the appropriate standard of review.

Historically, in equitable cases such as this one, our review has been *de novo*. In other words, we have "independently assess[ed] and evaluate[d] the evidence," *State ex rel SOSCF v. Frazier*, 152 Or App 568, 572, 955 P2d 272, *rev den*, 327 Or 305 (1998), and have "reweigh[ed] the facts and reassess[ed] the persuasive force of the evidence," *Marvin Wood Products v. Callow*, 171 Or App 175, 180, 14 P3d 686 (2000).

As pertinent to the dispositive issue in this case, in *Cooksey*, we explicitly held that the then-extant version of ORS 19.415(3)[9] mandated that we review a trial court's best interests determination *de novo*. Specifically, we reasoned:

"[W]e review the trial court's best interests determinations *de novo*. ORS 19.415(3). There is, to be sure, some very strong phrasing in the cases concerning the 'discretion' of trial courts to make such determinations. *See, e.g., Meier*

---

[9] Specifically, the statute provided, in part, that "the Court of Appeals *shall* try the cause anew upon the record." (Emphasis added.)

[*and Meier*, 286 Or 437, 446, 595 P2d 474 (1979)] (relocation decisions are 'weighted with the presumption that the court has properly exercised its judicial discretion in determining what is for the best interest of the child'); *Willey* [*and Willey*, 155 Or App 352, 355, 963 P2d 141 (1998)] ('Determining whether to impose a [relocation] restriction is addressed to the sound discretion of the trial court.'). Giving such phrasing literal import, however, cannot be reconciled with the statute that controls our standard of review."

*Cooksey*, 203 Or App at 172 (fifth brackets in *Cooksey*).

In 2009, the legislature amended ORS 19.415(3)—on which our holding in *Cooksey* had been predicated—to make *de novo* review in equitable cases *discretionary* rather than mandatory. Specifically, ORS 19.415(3)(b) now provides that,

"[u]pon an appeal in an equitable action or proceeding other than an appeal from a judgment in a proceeding for the termination of parental rights, the Court of Appeals, acting in its sole discretion, *may* try the cause anew upon the record or make one or more factual findings anew upon the record."

(Emphasis added.) In light of that amendment, we must revisit the issue of the proper standard of review of a trial court's best interests determination.

In doing so, however, we are not writing on a clean slate. As we explained in *Cooksey*, the Supreme Court, in *Meier*, addressed the standard by which an appellate court reviews a trial court's best interests determination. Specifically, in *Meier*, the Supreme Court noted that "[t]he determination whether to permit or prohibit removal of the child from the state is addressed to the sound discretion of the court, the paramount consideration being the best interests of the [c]hild." 286 Or at 445 (internal quotation marks omitted). The court further explained that

"[i]t is also well-settled in Oregon that in making the determination of the best interests of the child, the trial judge is in a far better position to weigh the various factors which enter into the problem, and his decision should not lightly be disturbed by a court on appeal."

*Id.* at 446.

Further, following the 2009 amendments to ORS 19.415(3), we have indicated, in related contexts, that, when a trial court makes a determination that is based on the court's assessment of multiple factors under the particular facts and circumstances of a given case, that determination is properly reviewed for abuse of discretion. For example, in *Nice v. Townley*, 248 Or App 616, 620, 274 P3d 227 (2012), we considered a trial court's award of custody. As we explained in *Nice*, in determining the custody of a child, a trial court is required to consider the factors in ORS 107.137(1), which, as we describe below, 251 Or App at 188, are the same factors that the trial court was required to consider in this case. 248 Or App at 621. Noting that "[a] trial court exercises discretion in making a custody award and is in a better position than an appellate court to weigh the factors that enter into that determination," *id.* at 620-21, we ultimately held that "the trial court failed to properly exercise its discretion in making its custody determination under ORS 107.137 because it failed to properly consider the preference in ORS 107.137(1)(e) in favor of the primary caregiver," *id.* at 623.

In light of the Supreme Court's reasoning in *Meier* and our reasoning in *Nice*, we conclude that, unless we exercise our discretion to review *de novo*, our standard of review of a trial court's best interests determination is for abuse of discretion.[10] Thus, we will reverse only if a trial court's discretionary determination is not a legally permissible one. *See McCollum v. Kmart Corporation*, 228 Or App 101,

---

[10] In this case, father requests that we exercise our discretion to review the trial court's best interests determination *de novo*. In domestic relations cases, trial courts commonly make best interests determinations, which are often, as father contends, "case-determining ruling[s]." However, a presumption exists "against the exercise of discretion," and we will exercise it "only in exceptional cases." ORAP 5.40(8)(c). Because father has not explained why this is an exceptional case, and we do not perceive that it is such a case, we decline to exercise our discretion to review *de novo*.

Nevertheless, as we acknowledged at oral argument in this case, in the wake of the 2009 amendments to ORS 19.415(3) that eliminated mandatory *de novo* review, some uncertainty exists about the proper standards of review that apply to various trial court rulings (*e.g.*, best interests) in equitable cases. For that reason, and because in this case we have clarified our standard of review of a trial court's best interests determination, we note that, even if we were to exercise our discretion to review this case *de novo*, we would make the same determination that the trial court made—that is, relocating to Utah is in the children's best interests.

113-14, 207 P3d 1200 (2009), *vac'd on other grounds*, 347 Or 707, 226 P3d 703 (2010) ("'Abuse of discretion,' as a legal term of art, means that the court's action or decision was not 'within the range of legally correct discretionary choices' and did not produce a 'permissible legally correct outcome.'" (quoting *State v. Rogers*, 330 Or 282, 312, 4 P3d 1261 (2000))); *Forsi v. Hildahl*, 194 Or App 648, 652, 96 P3d 852 (2004), *rev den*, 338 Or 124 (2005) ("The trial court abuses its discretion if it exercises that discretion in a manner that is unjustified by, and clearly against, reason and evidence.").

In this context, however, the court's discretion is not unbridled; rather, it is guided by the factors identified in ORS 107.137(1).[11] *Cooksey*, 203 Or App at 172. Specifically, ORS 107.137(1) provides that, in making a best interests determination, the court "shall consider the following relevant factors," none of which, alone, is dispositive:

"(a)   The emotional ties between the child and other family members;

"(b)   The interest of the parties in and attitude toward the child;

"(c)   The desirability of continuing an existing relationship;

"(d)   The abuse of one parent by the other;

"(e)   The preference for the primary caregiver of the child, if the caregiver is deemed fit by the court; and

"(f)   The willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child. * * *"[12]

---

[11] Although mother and father never married, their rights and responsibilities concerning parenting time are governed by the same standards as those of married parents. *See* ORS 109.103(1) (providing, in part, that unmarried parents "have the same rights and responsibilities regarding the custody and support of, and parenting time with, their child that married or divorced parents would have, and the provisions of ORS 107.093 to 107.449 that relate to custody, support and parenting time * * * apply to the proceeding").

[12] Father contends that the factor concerning the preference for the primary parent, ORS 107.137(1)(e), and the factor concerning one parent's abuse of the other, ORS 107.137(1)(d), are not relevant to this case because "[f]ather is not seeking custody," his "abuse of mother is years old," and no one "has suggested * * * that mother is under some kind of continuing threat of abuse by father." We disagree with father's contention, noting only that ORS 107.137 expressly provides that a trial court "*shall* consider those relevant factors," among others, "[i]n determining the best interests and welfare of the child." (Emphasis added.)

The court's discretion is also informed by "the legislative directive to, in reviewing a parenting plan, 'recognize the value of close contact with both parents and encourage, when practicable, joint responsibility for the welfare of [the] children and extensive contact between the minor children *** and the parties.' ORS 107.105(1)(b)." *Maurer and Maurer*, 245 Or App 615, 628, 262 P3d 1175 (2011) (brackets in original). Further, Oregon has a public policy preference to "[a]ssure minor children of frequent and continuing contact with parents who have shown the ability to act in the best interests of the child," ORS 107.101(1), and to "[e]ncourage such parents to share in the rights and responsibilities of raising their children," ORS 107.101(2).

With those principles in mind, we turn to the dispositive issue in this case—that is, whether the trial court abused its discretion in determining that relocating to Utah was in the children's best interests. At the outset, we note that father does not contend that, in making its best interests determination, the trial court failed to consider the factors in ORS 107.137(1) or the public policy to ensure a child's frequent contact with his or her parents.[13] Instead, father contends that the trial court's best interests determination was legally erroneous because (1) mother demonstrated only that relocating was in her best interests and not the children's and (2) his parenting time will be less frequent and the quality of that time will be diminished. For the reasons explained below, we reject both of father's contentions.

We begin with father's contention that mother demonstrated only that relocating was in her best interests and not the children's. In support of that contention, he relies on our decisions in *Herinckx*, *Cooksey*, and *Fedorov*, in which the custodial parents were not allowed to relocate because they had failed to demonstrate that relocating was in their children's best interests.[14]

---

[13] *Cf. Nice*, 248 Or App at 623 (vacating and remanding a trial court's custody award where "the trial court failed to properly exercise its discretion in making its custody determination under ORS 107.137 because it failed to properly consider the preference in ORS 107.137(1)(e) in favor of the primary caregiver").

[14] *See Herinckx*, 231 Or App at 57 (determining that relocating to Illinois was not in the child's best interests where it was motivated by the mother's desire to follow her fiancé and the child's loss of the relationship with the mother's fiancé did not "outweigh the inevitable damage to all of the child's other relationships,

Contrary to husband's assertion, however, this case is materially distinguishable from *Herinckx*, *Cooksey*, and *Fedorov*, because there is evidence that relocating to Utah will benefit the children and mother's ability to care for them. As the trial court explained, because mother—the custodial and primary parent—has a "bona fide * * * job offer" in Utah, mother and the children's standard of living will improve if they move to Utah. Moreover, as the court reasoned, the children would be better served by living near mother's extended family because (1) the children already had established relationships with mother's extended family; (2) mother's extended family had and would continue to provide emotional and financial support to mother and the children; and (3) father was not in a position to "support [m]other as a parent" if she were required to stay in Oregon.

In those respects, this case is similar to *Maurer*. In *Maurer*, the mother proposed relocating with the parties' children from Lake Oswego to California. 245 Or App at 617. The mother sought to relocate because she had job opportunities that were unavailable in Oregon and she had extended family in California, including her parents and brother, to whom the children were close and who could provide childcare while the mother was working. *Id.* at 618-20.

Ultimately, we affirmed the trial court's determination that relocating to California was in the children's best interests. *Id.* at 616. We reasoned that, because the mother was motivated to move by the need to find employment and because the proximity to her extended family—to whom the children were bonded—would benefit the children, "the move ha[d] significant benefits not only for mother, but also for the children."[15] *Id.* at 635.

---

especially her relationship with [the] father"); *Fedorov*, 228 Or App at 64 (affirming the trial court's determination that relocation to Australia was not in the child's best interests; explaining that "nearly all of the benefits that [the] mother describes are benefits to her, not to her child"); *Cooksey*, 203 Or App at 173 (determining that relocating from North Bend to Klamath Falls was not in the child's best interests because there was nothing in the record concerning "the effect on [the child] of relocating to Klamath Falls or about the effect that the proposed move would have on [the] mother's ability to care for him" and because "[t]he record show[ed] only that [the] mother wishe[d] to move to Klamath Falls so that she [could] be closer to her family").

[15] *Maurer* is not the only case in which we have allowed a custodial parent to relocate with his or her children. For example, in *Hamilton-Waller and Waller*,

Although our review in *Maurer* was *de novo,* our reasoning underscores the permissibility of the trial court's reasoning in this case. Thus, we reject father's contention that mother demonstrated only that relocating to Utah would be in her best interests.

Father also contends that the trial court's best interests determination was legally erroneous because, if the children are allowed to relocate to Utah with mother, he will have less frequent parenting time and the children will also have less frequent contact with their siblings and father's wife, with whom they are bonded and have positive relationships. Relatedly, father is concerned that the quality of his parenting time will suffer as well. Specifically, he contends that, because his parenting time will essentially be determined by the children's school calendar, the children will necessarily "spend part of their time at [his] home in day care, and without [him], [his wife] or their siblings present for a good portion of the day."

Despite father's concerns about the frequency and quality of his parenting time if mother is permitted to relocate with the children to Utah, the trial court modified the parenting plan to allow father parenting time with the children approximately four times per year, for extended two-week visits. Although the trial court recognized that the children's relationships with father, their siblings, and father's wife may suffer in some respects because of their relocation, it determined, as set forth above, that "the multiple benefits that are afforded by [m]other's move outweigh the detriment of giving up an alternating parenting schedule to the children."

Reduced to its fundamental core, father's appellate contention is that the trial court's best interests determination was legally erroneous because the trial gave

202 Or App 498, 123 P3d 310 (2005), we held that relocating to Holland with their mother was in the children's best interests. In doing so, we noted that the children would have enhanced educational opportunities in Holland and that there were better resources there for the child who had special needs. *Id.* at 519. Further, on *de novo* review, we found that the "evidence demonstrate[d] that father ha[d] not been nearly as involved as mother in caring for the children and meeting their needs," *id.* at 516, and that, "[o]n balance, * * * it [was] in the children's best interests to remain with [their] mother" because "[s]he ha[d] been their primary caregiver and she [was] the parent with whom they ha[d] the most extensive relationship," *id.* at 521.

too little weight to the policies designed to ensure that the noncustodial parent has frequent parenting time. *See* 251 Or App at 189 (describing those policies). However, we conclude that, on this record, the trial court's determination that the benefits of the move to the children outweighed the costs was not an abuse of discretion. It was a legally permissible determination, justified by reason and evidence. *McCollum*, 228 Or App at 113-14; *Forsi*, 194 Or App at 652.

As the trial court reasoned, the move can give the children the stability and support that they need. Mother and the children have had limited income; mother has worked, but her work has been part time and she has not made more than $12,000 a year. As a result, mother and the children have been financially dependent on others. The move will put mother and the children on a path to firmer financial ground and, thereby, provide them significant immediate and long-term benefits. The move will make it possible for them to achieve economic self-sufficiency. As the trial court observed, "the stability and employment" of a primary, custodial parent such as mother "is a critical piece of the child's success in life." On this record, the trial court could reasonably determine that the move—and the associated job opportunity and family support—would provide the children with the financial and emotional support that would put them in the best possible position, under the circumstances, to succeed in life.

Of course, as the trial court recognized, the move will have costs for the children; most significantly, it will alter their time with father, his wife, and their siblings. The trial court considered the costs of the move, and, after reasonably focusing on the fact that father was not in a position to support mother as a parent and had difficulty maintaining stable and consistently positive relationships, determined that the benefits of the move outweighed the costs. That determination was not outside the bounds of the trial court's discretion.

In sum, whether it is in the best interests of a child to relocate with the custodial parent is a determination that we generally review for abuse of discretion. To be sure, on any particular constellation of facts (even uncontroverted facts),

rational factfinders, weighing the pertinent considerations differently, may ultimately make different—albeit legally permissible—determinations as to what is in a child's best interests. Here, the trial court assessed the required statutory considerations and determined that it is in the children's best interests to relocate to Utah.

Affirmed.