In the Matter of the Marriage of

Jane FINNEY-CHOKEY,
*Petitioner-Respondent,*
*and*

Shane Russell CHOKEY,
*Respondent-Appellant.*

Multnomah County Circuit Court
130665898; A157466

381 P3d 1015

Beth A. Allen, Judge.

George W. Kelly argued the cause and filed the brief for appellant.

Mark Johnson Roberts argued the cause for respondent. With him on the brief was Gevurtz, Menashe, Larson & Howe, P.C.

Before Lagesen, Presiding Judge, and Garrett, Judge, and Schuman, Senior Judge.

**LAGESEN, J.**

In dissolving her marriage to father, mother requested that she be awarded custody of the couple's two-year-old daughter, E, and also that she be permitted to move with E from Portland to mother's hometown in the United Kingdom. Father did not oppose mother's request for custody, but father did oppose the requested move. The trial court determined that the move would be in E's best interest and granted mother's request. It then entered a general judgment of dissolution of marriage that, among other things, approved the requested move and provided that all of father's parenting time would be in the United Kingdom until E turned eight, at which point father would be entitled to have half of his parenting time in the United States (if father had not opted to move to the United Kingdom himself).

On appeal from that judgment, father contends that the trial court erred by approving the move, and by imposing the geographic restriction on father's parenting time. For the reasons that follow, we conclude that the trial court correctly applied the applicable law in approving the relocation, and did not abuse its discretion in determining that the move to the United Kingdom was in E's best interests. However, we conclude that the trial court abused its discretion by requiring that father exercise all of his parenting time in the United Kingdom until E turns eight; although the record would permit the imposition of a geographic restriction of a more limited duration, nothing in it permits the conclusion that it is in E's best interests for the restriction to extend until she reaches age eight. We therefore reverse and remand for the trial court to reconsider the extent to which a geographic restriction on father's parenting time is in E's best interests.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

Mother is from Brighton in the United Kingdom, where her family still lives. Father is from Indiana, where

---

[1] As required by our standard of review, discussed further below, we state the facts consistently with the trial court's decision. We draw them from the trial court's opinion where the court made express findings supported by the record, and from the evidence in the record where the court did not make express findings.

his family still lives. The parties met in Prague in 2003, while both were teaching English. After quitting their teaching jobs, the two traveled and then lived in France for several months. They decided to marry and were wed in Scotland in December 2004. After their wedding, they returned to mother's hometown, where they lived for about seven months, at which point the couple moved to California so that mother could pursue a degree in Chinese Medicine. Although mother considered pursuing her degree in the United Kingdom, she chose to do so in California because father, having been away from the United States for a long time, wanted to return. Mother completed her degree in December 2009, and the couple moved to Talent, Oregon, a month later. They did so because father wanted to live in Oregon, but not in a rainy part of the state. The parties lived together in Talent until May 2013, during which time mother gave birth to E in July 2012.

Throughout the parties' marriage, mother regularly found employment, but father did not. Father's only significant employment during the parties' relationship was the teaching job that he had held when the parties first met in 2003. During their time in Talent, mother worked full time as a medical assistant before E was born and also worked briefly in a part-time job at an acupuncture clinic after E's birth. When the parties had first moved to Talent, mother had tried for six months to establish a practice in Chinese Medicine but was unable to establish the practice in that time and, for that reason, sought other employment to earn income for the family. Father was not gainfully employed while the parties lived in Talent, but sometimes sold books on the internet and performed odd jobs. Father also obtained money from his parents, and his parents purchased a house in Talent in 2012, permitting the parties to live in it rent free.

After E was born, mother was her primary caregiver. Father handled E's early morning feedings, but mother handled the rest of E's care. Father displayed an "interest and good attitude" toward E, but played a secondary role in providing care for her.

In May 2013, the parties had a fight that led to mother's decision to dissolve the marriage. The fight ended

with father directing mother to leave the house with E and return to the United Kingdom. Mother had no place to stay in or near Talent, and E needed a passport to travel to the United Kingdom, so mother went to Indiana to stay with father's parents while E's passport application was processed. Father contacted mother while she was there and told her that she would need to return to Oregon for the parties to obtain a divorce.

Mother returned with E to Oregon, and found temporary housing in Portland. She filed for dissolution in Multnomah County in June 2013. Mother wanted to stay in Portland during the pendency of the proceedings because she did not have job opportunities or a support network in or near Talent and thought that Portland would provide more opportunities both for E and for her. Father requested that the court order mother to return to Talent with E, but the court instead entered an order directing that mother and E live in Portland during the proceedings. At the time, mother informed the court that she wanted to move with E to the United Kingdom after the divorce was finalized, unless the court ruled that she was not permitted to do so, in which case she would establish a permanent residence in Portland. The court concluded that E should reside in Portland with mother during the dissolution proceedings. Father then informed the court that he would move to Portland to be closer to E, and the court established a parenting time schedule for the pendency of the proceedings.

Two months later, pursuant to a stipulation by the parties, the court appointed Dr. Vien to perform a comprehensive custody and parenting plan evaluation with respect to E. Vien conducted the evaluation by interviewing parents, their families, and their friends, and issued a report on the evaluation in January 2014. In the report, Vien recommended that the court allow E to relocate to the United Kingdom because the move would provide a better living situation for E. Vien explained that the family had no "vocational, social, educational and financial ties to Portland," but had substantial ties to the United Kingdom, given that they previously had lived there at the start of their marriage, and had the support of maternal relatives there. Vien

opined that it would be easy for the family to assimilate to life in the United Kingdom given their previous experience living there, and that "[r]elocation will allow [E] affiliation with stable and available family members, promoting her security, trust and identity formation." Vien further opined that E would have greater opportunities for enrichment in the United Kingdom than she would in Portland, in light of the challenges parents would face in Portland as they "attempt to achieve gainful employment and residential permanency while arranging dependable childcare for their offspring." Vien further concluded that the timing for the proposed relocation was optimal, in light of E's age and the fact that moving would "permit[] parents a 'new start' without interruption of commitments, routines, and relationships in Oregon."

Upon the parties' requests, Vien later issued an addendum to his report, addressing the appropriate long-distance parenting plan for E, should the court approve E's relocation but father remain in Oregon. Vien opined:

"With respect to the long distance parenting plan between Oregon and the UK, quarterly contact between [father] and his daughter [E], is recommended. The parenting time should occur on an alternating basis in the UK and Oregon, initially consisting of five consecutive days for up to eight hours daily. At age four, the schedule should be expanded to seven consecutive days, including alternating overnight contact after the third day. At age seven, the seven day periods should be consecutive overnights including a two week (fourteen day) summer block in the US to allow for extended vacation travel. At age ten, the summer period should be expanded to a three week duration, permitting [father] extended access to promote [E's] paternal relationship. As [E] enters school, parenting time should correspond to holiday/vacation periods to minimize academic disruption to the child while allowing for unobstructed contact. It is also assumed that parenting time in Oregon will occur at [father's] residence and reasonable accommodations that will be arranged in the UK."

After Vien issued his reports, the case proceeded to trial. The primary issue that the parties asked the court to resolve was whether mother would be permitted to relocate to the United Kingdom with E or whether, instead, E should

remain in Portland. Before trial, the parties informed the court that they would stipulate that mother should have custody of E unless the court decided not to approve the relocation, and mother decided to move anyway. In that event, the parties agreed that E would stay with father. As to the relocation, the parties agreed that the issue for the court was whether it was in E's best interests under the factors listed in ORS 107.137(1). The court then heard five days of testimony and argument from the parties, their friends and their family members, addressing the relative costs and benefits to E of a move to the United Kingdom versus remaining in Portland. In her testimony, mother also addressed Vien's recommended parenting plan if the court approved the relocation but father remained in the United States. Mother testified that she agreed with Vien's recommendations except for the recommendations that part of father's parenting time take place in the United States while E was still very young. Mother explained that travel would be difficult for E while she was still young and that it would impair the quality of her relationship with father if E was required to fly to Oregon to meet father during the "first few years" after the move. As a result, mother thought that it would be in E's best interests for all of father's parenting time with E to take place in the United Kingdom initially.

The court also heard testimony from three experts: Vien, Dr. Guastadisgeni, a psychologist retained by father, and Broten, a vocational expert retained by father.

Vien elaborated on the recommendations in his reports. He explained that E would face difficulties in Portland that she would not face in the United Kingdom. Because of parents' lack of connections to Portland, E would face residential instability, disruptions in care, and disruptions in beginning "peer activities groups" as parents worked to find jobs and residences. By contrast, if E were to move to the United Kingdom, she would have "predictable and secure residential availability," predictable access to health and educational services, the support of extended relatives, and a family committed to facilitating E's ongoing relationship with father, regardless of whether father decided to move. In Vien's view, "the efforts that it would take to even

approximate [in Portland] those services [available to E in the United Kingdom] * * * is quite daunting."

As to the long-distance parenting plan that should be implemented if the court permitted the relocation and father remained in Oregon, Vien reiterated his recommendation that father have quarterly parenting time, alternating between the United Kingdom and father's home in Oregon. Vien explained that father's time with E in the United States should increase as E grew older, to include annual two-week summer blocks once E turned seven, to be increased to annual three-week summer blocks once E turned 10. Although Vien described the plan as "suboptimal," he opined that it would be the best alternative for E if father remained in Oregon and E moved to the United Kingdom.

Guastadisgeni testified that, in general, it is better for a child to have both parents present and actively involved in the child's life. He opined further that, when a child has formed an attachment with a parent, the disruption of that attachment can cause the child to have anxiety and behavioral issues and can affect the quality of the child's long-term personal relationships. He acknowledged that a child could maintain an attachment with a parent who lived far away through technological means such as Skype, but opined that, in such circumstances, a child loses some of the qualitative benefits of an in-person relationship with the parents. Guastadisgeni testified that he could not speak to what would be in E's best interest under the circumstances because he had not spoken with or evaluated father, mother, or E.

Broten testified regarding mother's potential employment opportunities in Portland versus the United Kingdom. Although Broten did not speak to mother or have detailed information about mother's personal, educational, or employment history, Broten opined that mother had better opportunities for employment in Portland than in the United Kingdom.[2] Broten had not been able to identify any current

---

[2] In its opinion, the trial court stated that it "found credible the testimony of mother, her mother, and the vocational expert, [Broten], that Mother will be able to develop her practice sooner and with less additional financial burden in

positions for mother in Portland, but, based on conversations with admissions staff at two local schools of natural medicine, Broten thought that "Obamacare" would lead to greater career opportunities in the northwest than mother would have in the United Kingdom. To assess mother's opportunities in the United Kingdom, Broten explained that she had researched mother's home town and job statistics on the internet but had not spoken with any schools or practitioners in the United Kingdom about job prospects in mother's field.

The court took the matter under advisement and ultimately issued a letter opinion in which it determined that mother should be awarded custody of E, and that relocation to the United Kingdom with mother would be in E's best interests. Notwithstanding the parties' stipulations regarding custody, the court first addressed each of the factors listed in ORS 107.137(1)[3] and concluded that those factors

---

Brighton." As father points out, Broten did not testify that mother could develop her practice sooner in Brighton; Broten testified that mother had better opportunities in Portland. It appears that the court's reference to Broten was a misstatement; it is clear to us from the court's additional explanation of its finding that the court was crediting the testimony of mother and her mother, over the contrary testimony of Broten, in finding that the support network available to mother in the United Kindgom would make it easier for her to develop her practice in that country. In other words, the facts on which the court expressly relied came from the testimony of mother and her mother, not from Broten:

"First, [mother] has plentiful contacts and a 'network' of potential referrals. Second, she need not encumber herself with residential expenses, having available to her free housing. Third, she will have the benefit of family members who can assist in child care, and will have access to no-cost child care that is government regulated and undisputed to be of good quality. Although day care is obviously available here too, it is not free, and the quality varies."

Father does not suggest that the court's misstatement about Broten's testimony would, in and of itself, require reversal or remand and, in view of the court's explanation of its ruling, we do not think that a remand is required as a result of the misstatement.

[3] ORS 107.137(1) provides:

"Except as provided in subsection (6) of this section, in determining custody of a minor child under ORS 107.105 or 107.135, the court shall give primary consideration to the best interests and welfare of the child. In determining the best interests and welfare of the child, the court shall consider the following relevant factors:

"(a) The emotional ties between the child and other family members;

"(b) The interest of the parties in and attitude toward the child;

"(c) The desirability of continuing an existing relationship;

favored a determination that it would be in E's best interest to remain in mother's custody. It then concluded that, for the same reasons, those factors, along with additional facts adduced at trial, demonstrated that the move was in E's best interest.

Specifically, as to the statutory factors, regarding E's emotional ties with other family members, ORS 107.137(1)(a), the court found that E had bonds with both sets of grandparents, but not with other relatives. Based on that finding, the court concluded that the first factor favored neither party.

As to the parties' respective interests in, and attitudes toward, E, ORS 107.137(1)(b), the court found that mother, since birth, had taken the lead in caring for and parenting E, was aware of E's developmental needs as well as E's desires, and had made efforts to provide suitable educational opportunities for E. The court found that father, in contrast, was a "(sometimes) 'supportive' co-parent." Noting that "Father was content to let Mother leave with" E after father directed mother to move out of their house, the court found that it was "only once [father] learned that Mother wished to move out of the country that he expressed an active interest in participating in [E's] life in a daily and sustained manner." Although the court found that father loved E, the fact that father's active interest in E began only after mother indicated that she wished to return to the United Kingdom caused the court to "have some concern that Father's interest may wane and his positive attitude fade some once these proceedings have concluded." Based on those findings, the court concluded that the second factor weighed in favor of mother in the relocation dispute.

---

"(d) The abuse of one parent by the other;

"(e) The preference for the primary caregiver of the child, if the caregiver is deemed fit by the court; and

"(f) The willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child. However, the court may not consider such willingness and ability if one parent shows that the other parent has sexually assaulted or engaged in a pattern of behavior of abuse against the parent or a child and that a continuing relationship with the other parent will endanger the health or safety of either parent or the child."

Regarding the desirability of continuing an existing relationship, ORS 107.137(1)(c), the trial court found that father had an existing relationship with E, and that it was desirable for that relationship to continue. The trial court further found that the move to the United Kingdom would limit father's in-person contact with E if father chose not to move. Based on those findings, the court determined that the third factor favored father in the dispute.

As to the abuse of one parent by the other, ORS 107.137(1)(d), the trial court found that there were no allegations of abuse but that father at one point had "angrily grabbed [E] from Mother's arms and placed the distraught child roughly into the car-seat." The trial court deemed that conduct "unacceptable" but did not find the "conduct significant enough to allow it much weight in my decision."

Addressing the preference for the primary caregiver, ORS 107.137(1)(e), the trial court found that mother was the primary caregiver, that mother was a "sensitive, attentive and responsive" caregiver, and that father was a consistent but "secondary" caregiver. The court further found that "there is no evidence that Father will be able to step into the role of [E]'s primary caregiver and be able to meet her needs." Based on those findings, the court determined that "preference must be given to Mother for her role as primary caretaker."

As to the last factor, the parties' respective "willingness and ability to facilitate and encourage a close and continuing relationship" between E and her other parent, ORS 107.137(1)(f), the court found that mother recognized the important role that father must play in E's life, that mother has a demonstrated record of facilitating the father-daughter relationship, and that mother is not seeking to move because of any animus toward father. The court found that father, by contrast, "seems to have gone out of his way to omit Mother from her co-parent role."

Beyond addressing the statutory factors, the court explained more explicitly why it found that the move was in E's best interest, even though it was possible that the move would result in E having diminished in-person contact with

father. The court stated that it was persuaded by Vien's assessment of the "numerous benefits" to E that would result from the move and thought them to be in E's best interests "particularly as compared to her interests should she remain in Portland." The court also found that father's employment instability meant that mother would have to be the "financial backbone" for E both immediately and long term, and that mother would be able to do so more effectively in the United Kingdom. Mother had a pending job offer in the United Kingdom from a family friend. That job would enable mother to provide for E until mother was able to develop her Chinese Medicine practice or obtain further education so as to become a researcher in the field. The court explicitly found that the benefits to E of the move were not just ancillary to any benefits to mother but, instead, would provide E with a better standard of living than she would have if mother and E had to stay in Portland.

In addition, the court discussed the likely effect of the move on father's relationship with E. It explained that it was not persuaded that requiring mother and E to remain in Portland would necessarily ensure that father and E had a close, in-person relationship because it was not persuaded that father would remain in Oregon just to be close to E:

> "I have little reason to believe that Talent (or Portland) is [father's] final destination. Talent met his desire to live somewhere that allows for an outdoorsy lifestyle. But, what really ties him to Talent, or even Oregon? What if his desire for outdoors activity wanes and some other pursuit better performed in some other state or country befits his whims? Were he to leave Oregon several years from now, Mother and [E] will have settled in and a move to the United Kingdom would be more difficult, and clearly not in [E's] best interests at that point. Thus, Father, as the parent who demands the Oregon locale, would have virtually foreclosed a change of locale for Mother and child."[4]

Relatedly, the court was also not persuaded that the move necessarily would interfere with father's relationship with E. Although the court acknowledged that father was

---

[4] The court recognized that mother had moved a number of times as well, but credited mother's testimony that the moves had been driven by father's preferences, and that she simply had ceded to his wishes.

unequivocal that he would not move to the United Kingdom, the court found that father had the capacity to move to the United Kingdom to maintain an in-person relationship with E: "I do not doubt his ability to navigate a way to live in Brighton again, if he were to choose to do so." In particular, the court found that it was not persuaded that father did not have the financial resources to move to the United Kingdom, given that he had benefitted from his parents' longstanding financial support.

After determining that the move to the United Kingdom was in E's best interests, the court established alternative parenting time schedules, one for if father chose to move to the United Kingdom, the other for if father chose to remain in the United States. The latter schedule specified that all of father's parenting time must take place in the United Kingdom up until E's eighth birthday, at which point father would be entitled to have a portion of his parenting time in the United States. The court memorialized its decisions in a general judgment of dissolution of marriage, which included the Parenting Plan ordered by the court. Paragraph 2.1.1 of the Parenting Plan set forth the court's requirement that father's parenting time take place in the United Kingdom until E's eighth birthday.

Father appealed. As noted, he assigns error to the trial court's decision to permit E to move to the United Kingdom, as well as to the court's decision to impose the geographic limitation on father's parenting time.

## II. STANDARDS OF REVIEW

Father has requested that we review *de novo*, arguing that *de novo* review would make review of his case faster. That desire for expediency, without more, does not demonstrate that this case is an "exceptional case" for which *de novo* review is warranted. ORAP 5.40(8)(c) (providing for *de novo* review only in "exceptional cases" unless otherwise required by law). For that reason, we decline father's request.

Having opted not to review *de novo*, we must identify the standards that otherwise govern our review. In approving E's move to the United Kingdom and establishing

the schedule for father's parenting time, the trial court applied the "best interests of the child" standard under ORS 107.137(1), as directed by our case law. *Cooksey and Cooksey*, 203 Or App 157, 125 P3d 57 (2005). As we understand his arguments, father argues both that the trial court erred in its application of that legal standard by not taking into account certain required factors in approving the move, and, alternatively, that, even if the court correctly applied the standard, it abused its discretion in determining that the move, and the geographic restriction on father's parenting time, were in E's best interests. Those challenges implicate three different standards of review.

First, whether the trial court applied the correct legal standard in making the challenged "best interests" determination presents a question of law that we review for legal error.

Second, if we determine that the trial court applied the correct legal standard, we review the court's "best interests" determination for abuse of discretion. *Sjomeling v. Lasser*, 251 Or App 172, 187-88, 285 P3d 1116, *rev den*, 353 Or 103 (2012). Under that standard, we must uphold the trial court's decision unless it exercises its discretion "in a manner that is unjustified by, and clearly against, reason and evidence." *Forsi v. Hildahl*, 194 Or App 648, 652, 96 P3d 852 (2004), *rev den*, 338 Or 124 (2005); *see also Sjomeling*, 251 Or App at 188 (citing *Forsi*, 194 Or App at 652).

Third, although father has not expressly challenged the trial court's factual findings, in conducting that review, we are bound by the trial court's explicit and implicit factual findings to the extent that the evidence in the record supports those findings. *Sjomeling*, 251 Or App at 173. In other words, we must view the facts in the same way that the trial court expressly or necessarily[5] viewed them, provided that view is supported by the evidence in the record.

---

[5] As the Supreme Court has explained, an implicit factual finding is one that, although not express, was necessary for the trial court to make to reach the outcome that it did, and is otherwise supported by the record. *Pereida-Alba v. Coursey*, 356 Or 654, 671, 342 P3d 70 (2015). If a particular factual finding was not necessary to the trial court's determination, and the trial court did not expressly make the finding, an appellate court will not presume that the finding was made. *Id.*

## III.   ANALYSIS

A.   *Relocation*

Under our case law, the decision whether to permit the relocation of children hinges "solely on the best interests of the children." *Cooksey*, 203 Or App at 172.[6] "[T]he focus is on the question whether the children are *'better* served' by relocating." *Id.* (quoting *Meier and Meier*, 286 Or 437, 447-48, 595 P2d 474 (1979) (emphasis in *Meier*)). In answering that question, a court must "examine the factors identified in ORS 107.137(1), along with the legislative directive to promote strong relationships between children and their noncustodial parents." *Id.*; *see also Sjomeling*, 251 Or App at 189 (noting legislative directive to promote and encourage "extensive contact" between parents and their children and joint parental responsibility for the welfare of children where practicable). Provided that the trial court considers the question under the correct legal standard, "[i]t is well-settled in Oregon" that the trial court is "far better" situated than an appellate court to evaluate "the various factors which enter into the problem," such that the trial court's "decision should not lightly be disturbed by a court on appeal." *Meier*, 286 Or at 446; *Sjomeling*, 251 Or App at 186-87.

On appeal, father argues both that the trial court applied the wrong legal standard in approving the relocation and that, in all events, the court abused its discretion in determining that the relocation was in E's best interests. We address his arguments in the sequence that he has presented them.

As to the legal standard, father first points out that, in analyzing the factors under ORS 107.137(1), the trial

[6] Mother argues that, because she is a foreign-born parent and, because the court was called upon to make the relocation decision in the context of an initial custody decision, it would also be appropriate for a court to take into account her interest in returning to her home country. In particular, she argues that the Supreme Court's decision in *Edwards and Edwards*, 191 Or 275, 227 P2d 975 (1951), stands for the proposition that her interest in returning to her native home would be a permissible factor to consider in deciding whether to approve the relocation. We express no opinion on those arguments, because there is no need to reach them in this case. The trial court did not apply the standard that mother advocates and, as we conclude, under the "best interests" standard that it did apply, it did not abuse its discretion in approving the move.

court's opinion refers to certain factors as "favoring" either mother, father, or neither party. Father contends that those references to the factors favoring one parent or another demonstrate that the court did not understand that its task was to determine whether those factors demonstrated whether the *move* was in E's best interests.

We do not read the trial court's decision in the same way that father reads it. In its decision, the court first determined which party should have custody of E. It was in the course of that discussion that the court referred to the factors as favoring a particular parent and ultimately concluded that the factors "favored" mother as the custodial parent. The court then addressed the question of relocation, stating expressly that all of the above factors played a role in its determination that the move was in E's best interests. In other words, the court understood that its task was to assess whether the move was in E's best interests, taking into account the ORS 107.137(1) factors.

Father next argues that the trial court legally erred because it did not take into account the harm that would come to E from a disruption in her relationship with father and, in particular, did not address the legislative directive to encourage frequent and extensive contact between minor children and their noncustodial parent. However, the trial court's decision belies father's argument, and reflects that the trial court took into account the potential negative effect that the move could have on E as a result of the possible disruption in her in-person relationship with father. But, in the end, the court simply was not persuaded that (1) requiring mother and E to stay in Portland necessarily would result in frequent and extensive contact between father and E, given the risk that father would leave Portland to pursue other interests; that (2) allowing the move would diminish father's contact with E, given that father had the capacity to move also if he wanted that contact, and that father could have frequent contact with E via Skype, in the event that he chose not to move; or that (3) the benefits to E of the move were outweighed by the potential for harm to her relationship with father, should father elect not to move.

Finally, father argues that the trial court abused its discretion in concluding that the move was in E's best

interests. But the custody evaluator determined that the move would benefit E and should be approved, and the other evidence at trial would support findings both that the move would provide E with greater stability in terms of residence, finances, and care than she would have in Portland, and that the one potential downside to the move—the disruption of her relationship with father—could be avoided if father, who had no ties to Portland himself, would move also. All of those facts would permit the conclusion that the move is in E's best interests.

In arguing that the trial court abused its discretion in approving the move, father relies heavily on *Fedorov and Fedorov*, 228 Or App 50, 206 P3d 1124, *rev den*, 347 Or 42 (2009). In *Fedorov*, on *de novo* review, we upheld a trial court's determination that a proposed move in that case was not in the child's best interests, concluding that we were not persuaded that any benefits to child outweighed the demonstrated harm to the child that the move would cause. But nothing in *Fedorov* compels the conclusion that the trial court's decision in this case—which involves a different child, different parents, and an entirely different set of circumstances—was an abuse of discretion. What is best for one child may not be best for another, and in every case in which a parent requests to relocate with a child, a court must make an individualized determination of whether the particular child is best served by the proposed move, taking into account the ORS 107.137(1) factors and the legislative directive to encourage regular and ongoing contact between the child and the noncustodial parent. And, in all events, this case has notable distinctions from *Fedorov*. For example, in *Fedorov*, the custody evaluator had advised against the move, finding that the harm to the child outweighed any potential benefit to her. 228 Or App at 57-58. Here, by contrast, the evaluator deemed the move to be advisable under the particular circumstances of this child and her family.

In sum, the trial court's conclusion that the move is in E's best interests is not contrary to the evidence or reason. *Cf. Sjomeling*, 251 Or App at 192 (concluding that trial court's approval of move to mother's hometown was not contrary to reason or evidence where move would put "mother

and the children on a path to firmer financial ground and, thereby, provide them significant immediate and long-term benefits," even though move would disrupt children's relationship with their father and siblings). The court, therefore, did not abuse its discretion in approving the move.

## B. *Geographic Restriction on Parenting Time*

Father next assigns error to the trial court's decision that his parenting time must take place in the United Kingdom until E turns eight. He argues that the trial court abused its discretion by "spontaneously" imposing that restriction, notwithstanding the fact that Vien's recommendation contemplated that E would spend some of father's parenting time in the United States with father. In response, mother acknowledges that she "generally agreed" with Vien's proposal at trial, but points out that she "expressed concern" about E traveling to visit her father at a young age, and that her concerns justify the court's imposition of the restriction.

We acknowledge mother's concerns, and the apparent concerns of the trial court, that travel would be disruptive for E while she was still very young. We agree with mother that, on this record, it would not be an abuse of discretion to impose a geographic restriction on father's parenting time for two to three years: mother expressly testified as to why it would be difficult for E to make the trip during the "first few years" of E's life and why the difficulties of the travel risked impeding E's formation of a good relationship with father, and father elicited testimony from both Vien and Guastadisgeni regarding the difficulties of travel for young children.

However, the duration of the restriction is "clearly against" the evidence in this case. Vien opined that quarterly visits should alternate between the United Kingdom and Oregon right away. Mother testified that she generally agreed with Vien's plan, but that "for the first few years" father's parenting time should take place in the United Kingdom because the travel would be very difficult on E during that time period. Nothing in mother's testimony or any other evidence suggests that a geographic restriction on father's parenting time, until E turned eight, would be in E's best interests. Significantly, mother never disputed

Vien's express recommendation that father should have a two-week block of parenting time in the summer with E in the United States once E reached the age of seven to allow father and E to travel within the United States. That suggests that mother agreed that by that time at the latest (if not sooner), it would be in E's best interests to spend time with her father in the United States.

Under those circumstances, the imposition of the restriction was an abuse of discretion. For that reason, we reverse and remand for the court to reconsider the extent to which a geographic restriction on father's parenting time with E is in E's best interests.

Reversed and remanded for reconsideration of Parenting Plan Provision 2.1.1; otherwise affirmed.